227 N.J. Super. 159 (1988)
545 A.2d 853
STATE OF NEW JERSEY, PLAINTIFF,
v.
ANTHONY BONACCURSO AND SALEM PACKING COMPANY, DEFENDANTS.
Superior Court of New Jersey, Law Division (Criminal Part), Gloucester County.
Decided March 15, 1988.
*161 Frank Cardiello, Deputy Attorney for General, for plaintiff (W. Cary Edwards, Attorney General of New Jersey).
Robert Agre, for defendants (Ballen, Keiser, Gertel, Feldman & Agre, Attorneys).
HOLSTON, J.S.C.
This matter comes before the Court on two separate motions of the defendant seeking to dismiss Counts # 1, # 2, # 5 & # 6 and Counts # 3 and # 4 of Indictment SGJ 172-86-2 which allege the unlawful discharge of pollutants in violation of N.J.S.A. 58:10A-6(a), 58:10A-10(f) and 2C:2-7 and unlawfully operating a facility for the collection, treatment or discharge of pollutants in violation of N.J.S.A. 58:10A-6(b), 58:10A-10(f) and 2C:2-7.
*162 Upon briefing and argument on defendant's motion as to Counts # 1, # 2, # 5 and # 6, this motion should more properly be categorized as a motion to suppress evidence and will be treated as such for purpose of this opinion.
On the return day of the motion, the Court heard testimony from three witnesses, Robert Vandergrift and Joseph Karpa, inspectors from the New Jersey Department of Environmental Protection and defendant, Anthony Bonaccurso. Upon hearing the testimony of these witnesses and judging the credibility of each, the Court makes the following findings of fact.
Defendant is the manager of Salem Packing Co., a meat packing plant or slaughterhouse located on approximately 125 acres in Salem, New Jersey. Mrs. Bonaccurso, wife of the defendant, is the owner of the Company. The site is extensively rural in nature. Part of the land is leased for farming while 22 acres are wooded and are leased and used for hunting. Signs indicating "No Trespassing" and "No Hunting" were tacked to various trees in the 22 acre portion five or six years prior by the hunter, Grant Merwin. The signs actually affixed to trees numbered 20-25 and bore the name of the hunter, Grant Merwin, as the person under whose authority they were posted. On no signs did the names Salem Packing Co. or Anthony Bonaccurso appear.
On March 7, 1984, Robert Vandergrift, a New Jersey Department of Environmental Protection (DEP) Inspector with the Division of Water Resources, responding to a complaint of a red substance in a local stream, accompanied by a locally known police officer, went to the packing house. Initially he had followed the stream for some distance through public lands until it became a ditch, eventually ending in a swampy area approximately 200 feet from the slaughterhouse. Throughout this travail, Inspector Vandergrift was not confronted by any fences or "No Trespassing" signs. (Presumably there were also no "No Hunting" signs confronted by Vandergrift.)
*163 Vandergrift presented himself at the offices of the plant and informed the receptionist/secretary of his identity, showed his credentials as a N.J. DEP Compliance Investigator and recited his authority to investigate the premises pursuant to N.J.S.A. 13:1D-9. The plant manager or person in charge was summoned and Vandergrift reiterated his identity, credentials and intention to inspect the premises for a possible source of pollution. In response, the manager or person in a supervisory capacity whose exact identity is unclear but who in any event was the individual summoned by the receptionist, stated that the inspector could do "whatever you want to do  let's go ahead and do it." Throughout this entire episode Vandergrift was accompanied by an inspector from the Salem Health Dept.
Vandergrift's ensuing inspection revealed the unauthorized discharge of bloody waste materials into the ditch which flowed across defendant's property. DEP directive letters were sent to the defendant advising him that he was in violation of the Water Pollution Control Act and to cease the discharging activity. The DEP was informed that a septic company, English Septic Disposal Company, had been hired to haul away the proven waste materials. Subsequent inspections revealed the defendant to be in compliance with the issued directives.
On March 20, 1986, DEP Investigator Joseph Karpa, accompanied by a Salem Health Dept. inspector, again responded to complaints in the vicinity of the plant. Karpa inspected a ditch running parallel to the public road in Quinton Township. To pursue the apparent source of the pollutant in the ditch, it was necessary to traverse certain private land and as such, permission was sought and received. During the ensuing hike of approximately three quarters of a mile through fields and wooded areas, Karpa saw no signs or fences designating a property division or which would raise an inference that trespassing was not allowed. The only exception was a dilapidated fence in a segment of the wooded area which had fallen down.
*164 After exiting the wooded area and crossing a field, Karpa came upon another ditch which was full of bloody waste water. At that point in time, Karpa was unsure of the ownership of the ditch so he proceeded to parallel it toward defendant's facility. At its closest point, the ditch was 300 feet from defendant's facility. Karpa observed a hose coming out of the ditch indicating that the discharge had been pumped into the ditch from the direction of the plant. The inspector then left the site and directive letters from the DEP were issued.
This Court finds as a fact that any signs previously posted by the hunter, who had leased 22 acres of wooded land for hunting purposes, were not standing at the time either Robert Vandergrift or Robert Karpa traversed any of the 125 acres owned by the defendant or on which any of the operation of Salem Packing Co. is conducted.

I. Motion to Suppress
Defendant's Motion to Suppress, Counts # 1, # 2, # 5 and # 6, rests on the argument that the above-mentioned searches were violative of defendant's constitutional right to be free of unreasonable searches and seizures since the entry by the DEP inspector was without a warrant nor was it based upon probable cause. The State concedes the warrantless nature of the search and does not argue the existence of probable cause. Instead, the State seeks to justify the warrantless search under the long-standing governmental regulation exception to the warrant requirement or, alternatively, as a search of an open field in which no warrant is required.
In New Jersey, an administrative search of private property without proper consent is generally held unconstitutional unless it has been authorized by a valid search warrant. State v. Dolce, 178 N.J. Super. 275 (App. Div. 1981). But the expectation of privacy normally attributed to Fourth Amendment protection in an individual's home does not appear as strongly in commercial premises. Donovan v. Dewey, 452 U.S. *165 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981). The expectation of privacy is particularly attenuated in commercial property employed in closely regulated industries. In these industries, the warrant requirement has been abandoned in the face of State or Federal regulations establishing inspection procedures premised on the fulfillment of enunciated policy objectives.
The origination and refinement of this doctrine was set forth by the United States Supreme Court in Colonnade Catering Corp. v. United States, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d (1970), and United States v. Biswell, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972). This exception to the warrant requirement has been adopted in New Jersey. See State v. Williams, 84 N.J. 217 (1980). (The liquor industry has historically been subjected to intense regulation and, thus, may be subjected to warrantless inspections.); State v. Rednor, 203 N.J. Super. 503 (App. Div. 1985) (The pharmaceutical industry has been subject to pervasive and long-standing control; warrantless inspections thereof are, thus, constitutional.)
Most recently, the U.S. Supreme Court has addressed this issue in New York v. Burger, ___ U.S. ___, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987). In Burger, five officers of the Auto Crimes Division of the New York City Police Dept. entered the defendant's junkyard to conduct an inspection of defendant's license and records of the automobiles and vehicle parts in his possession. The inspection was conducted pursuant to N.Y. Veh. & Traf.Law § 415-a5 (McKinney 1986).[1]
*166 In upholding the inspection, the Court set forth three criteria which must be met before a warrantless inspection of a pervasively regulated business will be deemed reasonable. First, there must be a substantial government interest that forms the basis of the regulatory scheme pursuant to which the inspection is made; second, the warrantless inspections must be necessary to further the regulatory scheme; finally, the statute's inspection program in terms of the certainty and regularity of its application must provide a constitutionally adequate substitute for a warrant. This final criterion must advise the owner of the commercial premises that the search is being made pursuant to the law, has a properly defined scope and it must limit the discretion of the inspection officers. The fulfilling of these criteria acts as a substitute for the warrant requirement.
The Water Control Act, N.J.S.A. 58:10A-1 et seq. states in its legislative findings and declarations:
... that pollution of the ground and surface waters of this State continues to endanger public health; to threaten fish and aquatic life, scenic and ecological values; and to limit the domestic, municipal, recreational, industrial, agricultural and other uses of water, even though a significant pollution abatement effort has been made in recent years. It is the policy of this State to restore, enhance and maintain the chemical, physical and biological integrity of its waters, to protect public health, to safeguard fish and aquatic life and scenic and ecological values and to enhance the domestic, municipal, recreational, industrial and other uses of water. [N.J.S.A. 58:10A-2].
*167 The Legislature has made it unlawful for any person to discharge any pollutant except in conformance with a valid N.J. Pollutant Discharge Elimination System permit issued by the Commissioner of the DEP, pursuant to the act. N.J.S.A. 58:10A-6(a).
To further the ends of the act, the Legislature has granted the DEP the right of entry to all premises in which a discharge source is or might be located. N.J.S.A. 58:10A-6(g). The release of biological material is considered an unlawful discharge of a pollutant. N.J.S.A. 58:10A-3(e) and (n). By regulation, the DEP has limited the scope of entry on a permittee's premises to reasonable times after the presentation of the inspector's credentials. N.J.A.C. 7:14A-2.5(9).
This Court finds as a matter of law that the statutory framework is constitutionally sufficient. The State has enunciated a substantial government interest and has enacted a legislative scheme in response which attempts to alleviate the problem in a manner which is reasonable in its time, place and manner.
Defendant's operation of a slaughterhouse which necessarily produces biological waste as a by-product clearly falls within the contemplation of the act and assuredly puts the defendant on notice of the possibility that his premises will be subject to an inspection by the DEP.
Defendant does not seriously dispute the pervasive regulation of the meat packing industry nor the constitutionality of the statute but instead, relying on State v. Williams, 84 N.J. 217 (1980), argues that the proper regulatory authority is the Department of Agriculture pursuant to N.J.S.A. 24:16B-1 et seq. and, therefore, the DEP could not investigate his premises without a warrant or a showing of probable cause.
In Williams, two detectives of the Paterson Police Department entered a tavern to search for stolen radios based upon a tip from an informant received two days earlier. Neither had a search warrant. During the search, the officers uncovered *168 illegal lottery paraphenalia, two loaded revolvers and a stolen citizens band radio. After a hearing, the trial court denied defendant's Motion to Suppress since he found the warrantless search to be authorized by N.J.S.A. 33:1-35 of the Alcoholic Beverage Control (ABC) laws. That section authorizes the Director of the Division of Alcoholic Beverage Control and each other issuing authority to "make such investigation as he or it deems proper ... concerning alcoholic beverages or the manufacture, distribution or sale thereof or the collection of taxes thereon, including the inspection of premises for which the license is sought or has been issued."
In reversing the trial court ruling, the Supreme Court held that there was no statutory authority for a warrantless search by local law enforcement officers conducting their own investigation of a crime without specific authorization. Since the officers were not making an investigation while enforcing A.B.C. laws, they could not claim any exception to the warrant requirement.
The holding of Williams is clearly distinguishable from the facts of this case. While it is true that the regulation of meant and poultry is covered by N.J.S.A. 24:16B-1 et seq., the policy underscoring this act is to ensure the health and welfare of the consumers purchasing the end product. N.J.S.A. 24:16B-2. The only reference in the act to the disposition of by-products is section 24:16B-29 which states that the "Board of Agriculture shall prescribe by rule or regulation the manner and disposition of the by-product of animals slaughtered or processed in a slaughterhouse."
Clearly, this provision does not envision an attempt to regulate the discharge of pollutants into the waters of the State or onto land or into wells from which it might flow or drain into said waters. N.J.S.A. 58:10A-3(e). The two acts have separate purposes and objectives. The mere fact that in an establishment like a slaughterhouse they overlap, does not negate one in the face of the other. The one visible result dictates that the *169 DEP and Department of Agriculture have concurrent jurisdiction over the slaughterhouse and its operation. Therefore, the warrantless inspection by the DEP inspector was proper.
Defendant next argues that since he has failed to seek a discharge permit for the DEP, he was not put on notice of the inspection provisions of the Water Control Act. This argument attempts to twist the provisions of the act so that a polluter who seeks to avoid securing the required permit has a greater level of protection than one who does not. Certainly the courts cannot sanction such a result. This holding finds support in the court's holding in New York v. Burger.
Finally, defendant attacks the search on the grounds that the inspecting officers failed to present their credentials as required by DEP regulation. Initially, it should be noted that the cited regulation applies solely to permittees which the defendant is not. In addition, the Court has previously found as a fact that Inspector Vandergrift complied fully with this requirement.
The right of entry authorized by N.J.S.A. 58:10A-6(g) gives the DEP the power to enter any premises in which a discharge source is or might be located. The language of the statute itself places no limitation on the scope or manner of the inspection. Finally, this authorization lacks the certainty and regularity of application to act as a warrant substitute. New York v. Burger, 107 S.Ct. at 2649.
However, in construing this statute, the Court is required to give the section a liberal construction to effectuate the purpose and intent of the act. N.J.S.A. 58:10A-12. Furthermore, in construing the scope of the DEP's investigatory power, the Court should note that the grant of authority to an administrative agency engaged in protecting the health and welfare of the public is to be liberally construed in order to enable the agency to accomplish its statutory responsibilities and the courts should readily imply such incidental powers as are necessary to effectuate fully the legislative purpose. In Re Guardianship *170 Services Regulations, 198 N.J. Super. 132 (App. Div. 1984). The Court is also mindful that if the right of inspection is to be effective and serve as a credible deterrent, unannounced inspections are essential.
Given these competing ends, it is this Court's opinion that implicit in the statutory right of entry is a requirement that the entry be reasonable in terms of its time, place and manner. Such a reasonableness requirement has explicitly been made a part of the regulations applying to permittees under this act and to inspections made pursuant to the Solid Waste Management Act, N.J.S.A. 13:1E-1 et seq.
Applying this requirement to the facts of this case clearly demonstrates the entry to be reasonable. Both inspectors testified that their entry on the defendant's premises was not impeded in any way by a fence or other indication of private ownership. The land surrounding the plant is rural in character and is used primarily for farming and hunting. Testimony of the defendant corroborated the lack of any fences but claimed that five or six years earlier a leasee of certain wooded sections of the land had put up approximately 20-25 signs reading "No Hunting" and "No Trespassing" and the name of the leasee, Grant Merwin. The defendant was unable to state with assurance if the signs were posted at the time of the entry by Vandergrift or Karpa nor could he enumerate any fact which would put the inspectors on notice of their entry onto defendant's property by seeing these signs.
While never addressed by the courts of this State, the "open fields" exception to the warrant requirement has been an established doctrine since Hester v. United States, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924). As stated by Justice Holmes: "The special protection accorded by the Fourth Amendment to the people in their persons, houses, papers and effects is not extended to the green fields." Hester, 265 U.S. at 59, 44 S.Ct. at 446. The holding makes it clear that an individual may not legitimately demand privacy for activities conducted out of *171 doors in fields except in the area immediately surrounding the home. Oliver v. United States, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984).
In defining the parameters of this doctrine, the Court has adopted a bright line rule which looks solely at the character of the land and excludes any consideration of whether the landowners had erected fences sufficiently high, posted a sufficient number of warning signs or located contraband in an area sufficiently secluded to establish a right of privacy. Oliver, 466 U.S. at 181, 104 S.Ct. at 1742-1743.
Defendant contends that the open fields exception should not be adopted in New Jersey or, in the alternative, that New Jersey should adopt a more restrictive version of the doctrine. In support of the argument, defendant cites New Jersey's prior expansion on Fourth Amendment protection. State v. Johnson, 68 N.J. 349 (1975) (consent search requires proof of defendant's knowledge that he could refuse); State v. Alston, 88 N.J. 211 (1981) (standing exists whenever defendant has possessory interest in property seized); State v. Novembrino, 105 N.J. 95 (1987) (officer's good faith belief doesn't create exception to exclusionary rule).
While New Jersey is not bound by the federal court's interpretation of the Fourth Amendment when interpreting our own Constitution, nevertheless, as stated by Justice Handler in State v. Hunt, 91 N.J. 338 (1982):
Our national judicial history and traditions closely wed federal and state constitutional doctrine. It is not entirely realistic, sound or historically accurate to regard the separation between the federal and state systems as a schism. The states are not always free to act independently under their own constitutions. State constitutions may be used to supplement or expand federally guaranteed constitutional rights. However, they may never be used to undermine or circumscribe them. U.S. Const. Art. VI cl. 2. See State v. Funicello, 60 N.J. 60, 69 (1972) (Weintraub, C.J. concurring). Furthermore, a considerable measure of cooperation must exist in a truly effective federalist system. Both federal and state courts share the goal of working for the good of the people to ensure order and freedom under what is publicly perceived as a single system of law. See Hart, "Relations Between State and Federal Law," 54 Colum.L. Rev. 489 (1954); Note, supra 13 Am.Crim.L.Rev. at 748-49. Moreover, while a *172 natural monolithic legal system is not contemplated, some consistency and uniformity between the state and federal governments in certain areas of judicial administration is desirable.
For these reasons, state courts should be sensitive to developments in federal law. Federal precedent in areas addressed by similar provisions in our state constitutions can be meaningful and instructive. We have recently recognized the importance of federal sources of constitutional doctrine. See General Assembly v. Byrne, 90 N.J. 376, 381-384 (1982). The opinions of the Supreme Court, while not controlling on state courts construing their own constitutions, are nevertheless important guides on the subjects which they squarely address.
Accordingly, it is this Court's opinion, that New Jersey would give a similar construction to Article I, Paragraph 7 of our Constitution, the analog of the Fourth Amendment, and adopt the open fields doctrine. The Court is in agreement with defendant that New Jersey would give a more restrictive interpretation of the exception. The facts of this case do not, however, require a definition of what outside parameters New Jersey would impose on the open fields doctrine as an exception to the warrant requirement of Article 1, Paragraph 7 of New Jersey's Constitution.
Clearly, the facts of this case demonstrate that the entry by the two DEP inspectors onto defendant's land which was neither fenced, posted as private nor to which a reasonable expectation of privacy could exist, was reasonable. Given its rural nature and wooded acreage with an undefined boundary line with the adjacent owner's lands, which land Karpa sought and obtained permission from its owner to traverse, the entry here was clearly a proper entry for purposes of the Water Control Act. Therefore, this Court finds that the acts of these two inspectors and evidence observed and/or seized fall within the open fields exception and are not constitutionally defective.
Based upon the foregoing findings of fact and conclusions of law, defendant's Motion to Suppress is denied.

II. Motion to Dismiss Indictment
Defendant seeks to dismiss Counts # 3 and # 4 of the above-mentioned indictment on the grounds that insufficient information *173 was placed before the Grand Jury from which they could find the defendant guilty of the offenses charged.
Counts # 3 and # 4 charge the defendant with unlawfully discharging pollutants and unlawfully operating a facility for the collection, treatment or discharge of pollutants between August 8, 1985, and March 13, 1986.
Said offenses being in violation of the provisions of N.J.S.A. 58:10A-6(a), 58:10A-10(f) and 2C:2-7, defendant contends that the only relevant evidence for this time period was supplied by Stephen Carfora, a DEP investigator. This testimony consisted solely of a review of defendant's business records and those of English Disposal Co. (English). These records indicate that English made no pickups of pollutants during the time period. English was the sole disposal company used by defendant during all relevant time periods covered by the indictment except for two pickups done in 1984. No testimony was offered of any actual inspection disclosing a discharge source.
The State counters that the Grand Jury is entitled to consider all the offered evidence and could reasonably infer that since testimony was given of discharge taking place in the time prior to and subsequent to the time period in Counts # 3 and # 4, that no removal of waste occurred during this period and that discharge of pollutants was taking place from defendant's plant.
Testimony from Vandegrift is encompassed in the time frame preceeding Counts # 3 and # 4. Testimony from two former employees of Salem Packing Co., Joel Scurry and Keith Scurry, both hired to clean up and pump out blood (presumably of slaughtered animals) and from Karpa constitute the grand jury testimony subsequent to the time frame encompassed in Counts # 3 and # 4. This Court concludes, therefore, that such an inference is legally permissible.
A motion to dismiss an indictment is left to the sound discretion of the trial court and should not be exercised except on the clearest and plainest grounds. State v. Weleck, 10 N.J. *174 355 (1952). On motion to dismiss an indictment, the burden of the evidence is on the movant. State in Interest of C.P., 212 N.J. Super. 222 (Ch. Div. 1986).
While the proffered evidence as to Counts # 3 and # 4 may not be sufficient to support the State's case at trial, the Grand Jury is entitled to consider all the evidence as a whole and each count does not have to stand on its own in considering the sufficiency of the indictment. State v. Wein, 80 N.J. 491 (1979). The State need only produce "some evidence" or "very little evidence" to uphold an indictment. See State v. Donovan, 129 N.J.L. 478 (Sup.Ct. 1943); Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1901).
Considering the low threshold required, the indictment is factually sufficient and defendant's motion to dismiss is denied.
NOTES
[1] This statute reads in pertinent part: "Records and identification. (a) Any records required by this section shall apply only to vehicles or parts of vehicles for which a certificate of title has been issued by the Commissioner (of the Dept. of Motor Vehicles) or which would be eligible to have such a certificate of title issued. Every person required to be registered pursuant to this section shall maintain a record of all motor vehicles, trailers and major component parts thereof, coming into his possession together with a record of the disposition of any such motor vehicle, trailer or part thereof and shall maintain proof of ownership for any motor vehicle, trailer or major component part thereof while in his possession. Such records shall be maintained in a manner and form prescribed by the Commissioner. The Commissioner may, by regulation, exempt vehicles or major component parts of vehicles from all or a portion of the record keeping requirements based upon the age of the vehcile if he deems that such record keeping requirements would serve no substantial value. Upon request of an agent of the Commissioner or of any police officer and during his regular and usual business hours, a vehicle dismantler shall produce such records and permit said agent or police officer to examine them and any vehicles or parts of vehicles which are subject to the record keeping requirements of this section and which are on the premises.... The failure to produce such records or to permit such inspection on the part of any person required to be registered pursuant to this section as required by this paragraph shall be a class A misdemeanor."