251 N.J. Super. 55 (1991)
596 A.2d 1090
NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, PLAINTIFF-RESPONDENT,
v.
GERALD DURAN, SR., AND GERALD DURAN, JR., DEFENDANTS-APPELLANTS,
v.
EDWARD VANCE,[1] DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Submitted May 7, 1991.
Decided May 22, 1991.
*57 Before Judges ANTELL, O'BRIEN and SCALERA.
McKenna, Liska and Leone, attorneys for appellants (Paul F. Jannuzzo, of counsel and on the brief).
Robert J. Del Tufo, Attorney General, attorneys for respondent (Mary C. Jacobson, Deputy Attorney General, of counsel, James M. Murphy, Deputy Attorney General, on the brief).
PER CURIAM.
On October 6, 1989 the New Jersey Department of Environmental Protection, Division of Fish, Game and Wildlife (DEP) issued complaints to Gerald Duran, Sr. and his son, Gerald Duran, Jr., (the defendants) for possessing 214 detached American short lobster tails in violation of N.J.S.A. 23:5-9b. They moved to suppress the evidence seized, challenging the warrantless search made by DEP personnel and the accuracy of the measurement device used on the lobster tail segments. This motion was heard subsequent to the actual trial.
This matter was tried on January 22, 1990 and some evidence relating to the search and seizure issue was received then. On March 19, 1990 the trial court heard further testimony regarding the search and seizure issue and the measurement device *58 used. Eventually, it denied the motion to suppress and assessed civil penalties of $1,250 against each of the appealing defendants.
The operative facts are largely undisputed. This action arises out of the possession of illegal short lobsters, where the sixth tail segment measured in a flex position along the dorsal midline is less than 1 1/16 inch.
Mark A. Chicketano, an enforcement officer with the New Jersey Division of Fish, Game and Wildlife, testified that, in September 1989 his office received information from a "reliable" confidential informant that illegal short lobsters were being sold at the General Motors plant in Linden, New Jersey out of a 1978 brown Cadillac, which turned out to belong to Edward Pantle. On September 21, 1989, Chicketano and Robert Manna, a special federal agent with the National Marine Fishery Service, surveilled that particular vehicle at the G.M. plant. At 8:40 a.m., Manna approached Pantle and asked if he was the person who sold lobsters. Pantle answered that he "didn't have any lobsters today because the boat didn't fish yesterday ..." He advised, however, that he anticipated having some later in the day because the boat would be fishing that morning.
Later that afternoon Manna and State Conservation Officer Gary Finton began a surveillance of Pantle's residence, while Chicketano conducted a surveillance on the Port of Belford. There, Chicketano observed only the fishing vessel, Barge One, run by the Durans, come into port. Approximately one hour later Chicketano arrived at Pantle's and observed a male and a female in a pickup truck in Pantle's driveway packaging lobster parts. Chicketano measured some of the tails in the pickup truck with a "certified" gauge and arrested all three persons for possession of illegal lobster parts. At the Marine police station, based on information they gave, Chicketano suspected that Barge One was the source of those lobsters.
*59 After this incident, but "prior to setting up an operation to stop and inspect Barge One," another confidential informant advised that Edward Vance was selling illegal short lobsters throughout Monmouth County, and was currently a crewman on Barge One. Chicketano also had seen Vance's vehicle at Belford on more than one occasion and the Coast Guard informed him that Vance had been seen aboard Barge One.
On October 6, 1989, Chicketano, Manna and members of the Coast Guard were aboard an unmarked boat. When Barge One approached they stopped it, identified themselves and requested permission to board and inspect the catch. Vance and the Durans granted permission. Once aboard, the agents indicated they wanted to look around for illegal lobsters and Duran, Jr. said, "Go ahead. Look anywhere you want."
In the pilot house Chicketano noticed the same type of green plastic cinch-sac bags used at Pantle's house. The agents examined a wooden compartment approximately 7 feet by 2 feet. The edges of the screws therein were "fairly rusty" while the indentations were somewhat shiny, indicating that the screws had been used recently. Chicketano then removed some of the screws and Manna reached in and discovered short lobsters in plastic bags. Duran acknowledged there were five dozen in each of the bags, the same count found in the Pantle incident. Chicketano measured some of the lobster tails with a "certified" tail gauge and found them to be under legal limit. Two hundred and fourteen unlawful detached American lobster tails were found and all defendants were arrested.
After the incident at the Pantle residence and prior to the search of Barge One, Chicketano testified that he personally did not believe he had probable cause to establish that the Duran vessel was bringing in these illegal lobsters and he had doubts whether a magistrate would have issued a warrant based on the information he had. However, he insisted he had at least a "reasonable suspicion to believe that Barge One was involved in this activity." Moreover, Chicketano conceded he had not informed *60 the defendants that they could refuse to consent to the search of the boat. With respect to the measuring device, Chicketano testified this had been calibrated by N.J. Bureau of Weights and Measures and he produced a letter of accuracy issued by the Bureau.
Manna also testified that he became suspicious of the compartment on the vessel especially when Duran, Jr., said he owned the boat for 2 years and had never opened that compartment. He further insisted he was conducting a federal investigation as well and therefore it was unnecessary to pursue a warrant from a New Jersey judge.
Gerald James Duran, Jr., testified and denied that the agents had asked for permission to board or search the vessel. On cross-examination, he conceded he had lied when he told the agents that the compartment had never been opened during the time he owned the vessel.
Judge Paul F. Chaiet concluded that, while there was no probable cause in the "traditional sense," he felt that all that was required was adherence to the significantly lower standard of reasonable suspicion:
The necessity of protecting our coastal fish, the diminished expectancy of privacy on board a commercial fishing vessel and the officers' reasonable suspicion combined to form the necessity justifying this warrantless search.
Furthermore,
The court is satisfied that Chicketano and Manna were working together legitimately to enforce the fishing laws and that Manna's presence was not simply designed to give legitimacy to the actions of the State officer. As a matter of fact, the court has ruled that the actions of the State officer needed no legitimacy under the interpretation that the court has made of the "reason to believe" standard.
Thus, while he held that consent had not been freely and knowingly given to search the boat by those aboard, nevertheless he upheld the validity of the search. Regarding the accuracy of the gauge, he found fault with the certificate because it was dated over three years prior to this incident. Moreover, he did not understand what the certificate said and how it applied to the gauge in this particular case. Finally, he *61 concluded it was not sealed as required by N.J.S.A. 51:1-102. However, since Chicketano did testify regarding the validity of the solid metal measuring gauge which he produced and it was apparently, "a simple device that is not really subject to change," even though the certificate of accuracy was not "sealed" in compliance with the statute, the judge felt "safe" in concluding that it complies with the required standard and admitted it under Evid.R. 63(15).
The appellants raise the following contentions:
Point I: Lieutenant Chicketano did not have a reason to believe within the meaning of N.J.S.A. 23:10-20 and therefore the search he
conducted was unconstitutional and the evidence should be suppressed.
Point II: To ignore the probable cause and warrant language in N.J.S.A. 23:10-20 would denude the statute and ignore the Legislative intent behind the same.
Point III: There is no competent evidence as to the length of the lobsters seized and, therefore, the trial should have resulted in an acquittal.
The defendants assert that the trial judge incorrectly analogized the "reason to believe" standard of N.J.S.A. 23:10-20 with that of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) since the officer's safety was not a concern in the instant case. In the related Point II, defendants argue the intent of N.J.S.A. 23:10-20 is to authorize a warrantless search only in instances where there is not enough time to obtain a warrant and that since violations of this statute are quasi-criminal in nature, the statute must be strictly construed. Finally, defendants argue the court wrongly enlarged the search and seizure restraints by applying 16 U.S.C. § 1861.
N.J.S.A. 23:10-20 states in part:
A member of the Fish and Game Council, and any conservation officer may, without warrant search and examine any boat, conveyance, vehicle, fish box, fish basket, game bag, game coat or other receptacle for game and fish, when he has reason to believe that a provision of this Title, or any law supplementary thereto, or the State Fish and Game Code has been violated, and shall seize and take possession of any firearms, bows and arrows, shells or cartridges, fishing rods and reels, fishing lines, knives, lights, slingshots, traps, spears, spear guns or any other article or equipment that has been illegally used or any bird, animal or fish unlawfully caught, taken, killed, had in possession or under control, shipped or about to be shipped. A court, upon receiving proof of *62 probable cause for believing in the concealment of a bird, animal or fish so unlawfully caught, taken, killed, had in possession or under control, shipped or about to be shipped, shall issue a search warrant and cause a search to be made in any place, and to that end, may, after demand and refusal, cause any building, inclosure or car to be entered, and any apartment, chest, box, locker, crate, basket or package to be broken open and its contents examined by a member of the Fish and Game Council or any conservation officer. (Emphasis added).
Judge Chaiet likened the statutory "reason to believe" term to patdown searches. While we do not fully subscribe to his reasoning, we agree that the warrantless search of the vessel and compartment was valid.
The Fourth Amendment of the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution are guarantees against unreasonable search and seizures. State v. Davis, 104 N.J. 490, 498-499, 517 A.2d 859 (1986). In the instant case, an administrative search was involved. Chicketano boarded Barge One while conducting an official investigation regarding a violation of regulatory statutes. As a general rule, while such a search must be authorized by an administrative search warrant, an exception to the warrant requirement exists in the case of a "sensitive and highly regulated industry." State v. Williams, 84 N.J. 217, 224, 417 A.2d 1046 (1980); State v. Rednor, 203 N.J. Super. 503, 507-508, 497 A.2d 544 (App.Div. 1985). As stated in Lovgren v. Byrne, 787 F.2d 857, 865 (3rd Cir.1986),
[O]ne who is engaged in an industry, that is pervasively regulated by the government or that has been historically subject to such close supervision is ordinarily held to be on notice that periodic inspections will occur and, accordingly, has no reasonable expectations of privacy in the areas where he knows those inspections will occur.
As pointed out in Lovgren, the fishing industry is pervasively regulated, and has been since 1793. Id. at 865 n. 8. See e.g. N.J.S.A. 23:2B-1 et seq. (The Marine Fisheries Management and Commercial Fisheries Act); N.J.S.A. 23:3-1 et seq. (Licenses and Permits); N.J.S.A. 23:5-1 et seq. (Seasons, Sizes and Creel Limits). Therefore, the persons operating Barge One necessarily had a reduced expectation of privacy therein allowing *63 Chicketano to board and search the vessel in the course of an ongoing investigation. Thus, a warrantless administrative search pursuant to N.J.S.A. 23:10-20 is authorized where there is "reason to believe" that a violation had occurred. Although Chicketano did not believe he had "probable cause," we have noted that "[t]he fact that the officer does not have the state of mind hypothesized by the reasons which provide the legal justification for the search and seizure does not invalidate the action taken, so long as the circumstances, viewed objectively, support the police conduct." State v. Kennedy, 247 N.J. Super. 21, 588 A.2d 834 (App.Div. 1991); see also State v. Bruzzese, 94 N.J. 210, 220, 463 A.2d 320 (1983) cert. denied 465 U.S. 1030, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1984).
Based upon the surveillances, the tip from a reliable informant, the arrest of three people, and the other information, Chicketano's suspicions were reasonably raised that Barge One and its personnel were involved in this illegal activity. Subsequently, another reliable informant also implicated Vance, who worked on the boat, as a trafficker of short lobsters. Thus, Chicketano had ample "reason to believe that a provision of (Title 23) ..." had been violated and could "without warrant search and examine" the boat. N.J.S.A. 23:10-20. Further, the general search conducted of the vessel also furnished reason to believe that the compartment was also being utilized therefor. Cf. State v. Stupi, 231 N.J. Super. 284, 288-289, 555 A.2d 681 (App.Div. 1989).
Moreover, where a search is valid and is conducted to prevent the disappearance of the evidence, an exception to the warrant requirement may exist. State v. Guerrero, 232 N.J. Super. 507, 511, 557 A.2d 713 (App.Div. 1989). In this case there was cause to believe that the evidence might be destroyed if the boat were allowed to proceed unimpeded. State v. Stupi, supra, 231 N.J. Super. at 288-289, 555 A.2d 681. Therefore, based upon such exigent circumstances, the warrantless search was further justified. Finally, we agree with the trial judge *64 that Manna independently had the statutory authority to conduct this search as a federal investigation pursuant to 16 U.S.C.A. § 1861(b).
The defendants also argue that the State failed to prove that the lobsters were short because the tail gauge used to measure the lobsters was not certified nor sealed pursuant to N.J.S.A. 51:1-102. Further, it is argued, Evid.R. 63(15) was effective long before that statute was enacted. Therefore, if the Legislature intended such certificates to be admitted under Evid.R. 63(15), there would have been no reason to enact the statute. Finally, they argue that State v. Kalafat, 134 N.J. Super. 297, 340 A.2d 671 (App.Div. 1975), relied upon by the trial judge to allow admission under Evid.R. 63(15), is inapposite because that case implies that the involved certificate was signed and sealed pursuant to N.J.S.A. 51:1-102.
The State argues that, at the time the lobster gauge was certified, the statute did not require the certificate of correctness to be sealed, therefore this certificate is inherently reliable. To require such certifications or to recalibrate and recertify every item would be unreasonable and therefore, the requirement of a seal only applies to new certifications.
N.J.S.A. 51:1-102 states:
Each weight or measure used by any weights and measures officer as a standard for testing the weights and measures used in trade, commerce or in:
a. Any weights and measures office;
b. The enforcement of law; or
c. Any engineering or surveying shall be marked by the State superintendent in such manner as he may determine. A certificate of the correctness thereof, designating it by number and giving the date of its comparison with any of the standard weights and measures shall be presumptive evidence that such weight or measure has continuously since the date of such comparison conformed with the said standards and the national and State standards. Such certificate shall be signed and sealed by the State superintendent in a manner determined by him.
Any certificate substantially setting forth the above facts and purporting to be signed and sealed by the State superintendent shall, upon its production, be admitted as such presumptive evidence without further proof of its authenticity. (Emphasis added).
*65 The requirement of a seal on a certificate of correctness became effective December 3, 1986. (L. 1986 c. 167 § 14.) In the instant case, the signed letter of accuracy, dated May 5, 1986, did not contain a seal. These particular lobsters were measured with the gauge sometime about October 6, 1989.
However, we cannot read an exception into this statute allowing certificates signed prior to December 1986 to be afforded a presumption of accuracy. Cf. State v. Maure, 240 N.J. Super. 269, 280-281, 573 A.2d 186 (App.Div. 1990), aff'd 123 N.J. 457, 588 A.2d 383 (1991). Thus, the trial judge was correct in not admitting the document pursuant to N.J.S.A. 51:1-102.
Instead, we hold that the certificate of correctness was properly admitted under Evid.R. 63(15) which states:
... a statement is admissible if in the form of (a) a written statement of an act done or an act, condition or event observed by a public official if it was within the scope of his duty either to perform the act reported or to observe the act, condition or event reported and to make the written statement....
The rationale of this rule reflects the special trustworthiness attributed to official statements made in accordance with an official's duty. State v. Hudes, 128 N.J. Super. 589, 602, 321 A.2d 275 (Cty.Ct. 1974). Also, it avoids requiring a public official to testify to an event he probably cannot remember. See Biunno, N.J.Rules of Evidence, Evid.R. 63(15) Comment. (1991). Here the Superintendent of the Bureau of Weights and Measures is just such a public official, Evid.R. 62(3), and this certification was made as part of his official duties. State v. Kalafat, supra, 134 N.J. Super. at 301, 340 A.2d 671. The certificate did refer to FG8, which was the same identification imprinted on the gauge itself.
Finally, the gauge was comprised of a linear piece of metal notched at the appropriate measurement, which was "not really subject to change." The fact that the certificate was dated May 5, 1986 does not affect its validity. Therefore, the trial judge was correct in admitting the document under Evid.R. 63(15).
Affirmed.
NOTES
[1] Edward Vance apparently has not joined in this appeal.