703 A.2d 696

STATE OF NEW JERSEY, PLAINTIFF, v. THOMAS C. GATES, II,
JAMES W. BETTS AND WILLIAM M. BONEY, DEFENDANTS.

Superior Court of New Jersey
Law Division
Atlantic County

Decided March 5, 1997.

*David Restaino,* Deputy Attorney General for the State of New Jersey.

*Robert Boney,* Esq. for defendant Thomas C. Gates, II; *James A. Waldron,* Esq. for defendant James W. Betts; *Michael Donohue,* Esq. for defendant William M. Boney.

GAROFOLO, P.J. Cr.

At issue is whether the so-called "open field doctrine" should operate to excuse the warrantless entry onto private lands by conservation officers investigating suspected violations of the State's fish and game laws.

On December 5, 1995, deer hunters told Conservation Officer Honachefsky that shots had been heard near the Tuckahoe Turf Farms at 11:30 p.m. the night before and at 5:30 a.m. that morning. A similar report was received on December 7, 1995. Hunting deer at night is specifically prohibited by *N.J.S.A.* 23:4–45(a). Those providing the information were not known by name to Officer Honachefsky, although he "may have seen them

around." He testified that the individuals could not be characterized as reliable in the sense that he had not previously received information from them.

The property in question, which is owned by the Betts family, is described as a mixture of wetlands, fields and forests behind the turf farms. While there was no evidence offered of the exact size of the area in question, the evidence gives the impression that a considerable amount of acreage is involved. The property was also described as an area "commonly hunted."

On December 7, 1996, Officers Honachefsky and Cianciulli walked onto the property to make observations. To do so they walked past a gate and a "No Trespassing" sign. Except for the gate, there was no other fencing and the gate was readily avoidable by use of an "ATV path" going around it. Once on the property, the officers located a pile of bait. Near the bait was a truck body, a likely place from which someone could hunt. Conservation Officer Honachefsky theorized that since the next day was the close of antlered deer season, that it would be the last night that a deer could be killed and receive a tag the next morning. Thus, the officers decided to stake out the deer blind that night. Honachefsky and Cianciulli did so, using the same means of ingress as they had earlier that day.

At approximately 12:30 a.m. on the morning of December 9, 1996, while they were stationed at the baited deer blind, the officers observed a motor vehicle come onto the field with its headlights on and a spotlight cast from the inside of the vehicle. They observed the vehicle cross a field of "cover crop" and continue to "spotlight" with a light twice brighter than the high beams of the vehicle itself. At that time the officers observed an object inside the vehicle which to one of them appeared to be a gun barrel and to the other as possibly an antenna. It was also observed that the tail lights on the vehicle were not illuminated. The officers then saw a deer "caught" in the spotlight. The suspect vehicle turned and gave chase for a short distance before breaking off the chase. The officers observed that the deer had

no antlers and theorized that the suspect hunters were interested in antlered deer only, since only an antlered deer could be properly tagged the next day. Thus the officers believed the chase ended once the suspect hunters determined that the deer had no antlers.

At that time the officers called Lt. Mark Stullenberger for assistance. Operating a four-wheel drive truck, he entered the property via a different route utilized by Officers Honachefsky and Cianciulli. Stullenberger drove onto the property from a public roadway onto a dirt road that led to the Cooper Swamp Gun Club, about 100 yards off the public road. He drove through the gun club parking lot to an adjacent dirt road and onto the subject property. He encountered no fences, gates or signs stating "No Trespassing."

Lt. Stullenberger met up with Officers Honachefsky and Cianciulli in the field about three-quarters of a mile from the public road and he was briefed on what they had observed. Approximately ten or fifteen minutes later, a truck was driven into the area. Its tail lights were not illuminated. At that time Stullenberger began to follow the suspect truck and activated his overhead red lights in an effort to stop it. The vehicle fled in the direction of Officers Honachefsky and Cianciulli who shined flashlights on the vehicle and its occupants in an effort to get the vehicle to stop. Rather than stop, the vehicle fled toward them requiring them to flee from its path. Stullenberger pursued the vehicle from the field and onto a dirt road into a heavily wooded area and also activated his siren. The chase continued for approximately four miles through field, woods, and swamps before the vehicle finally stopped. At that time the defendants were arrested. A search of the vehicle revealed a spotlight, spilled beer on the front seat, and unopened cans of beer in the rear of the vehicle. A search of the truck's path of flight was conducted and a loaded scope rifle was found about three-tenths of a mile from the point at which the truck had been stopped. Also found along the truck's flight path was an apparently discarded, partially empty, can of beer. The

defendants were charged with various fish and game violations as well as Title 39 and Title 2C violations. A motion to suppress was heard in municipal court and denied. This appeal *de novo* followed.

The defendants seek to suppress the fruits of the officers' intrusion on the grounds that a warrantless entry onto private lands was unreasonable and violative of Article I, Paragraph 7, of the New Jersey Constitution. They seek shelter from the New Jersey Constitution since the "open fields" exception has been long recognized by the Supreme Court of the United States. *Hester v. United States,* 265 *U.S.* 57, 44 *S.Ct.* 445, 68 *L.Ed.* 898 (1924). The doctrine was more recently reconsidered and ratified by the Court in *Oliver v. United States,* 466 *U.S.* 170, 104 *S.Ct.* 1735, 80 *L.Ed.*2d 214 (1984) and again in *United States v. Dunn,* 480 *U.S.* 294, 107 *S.Ct.* 1134, 94 *L.Ed.*2d 326 (1987). In *Oliver* the Court actually dealt with two cases from different jurisdictions. In the first, narcotics agents went to petitioner's farm to investigate reports that marijuana was being grown on the premises. They drove past petitioner's house to a locked gate with a "No Trespassing" sign but with a footpath around one side. They followed the footpath and walked down the road several hundred yards past a barn and a parked camper. An unidentified person yelled to them from the camper that "no hunting is allowed, come back up here." They continued, however, and over a mile from petitioner's house, found a field of marijuana. *Id.* at 173, 104 *S.Ct.* at 1738. In the second case, *Maine v. Thornton,* the police, acting on an anonymous tip that marijuana was being grown behind respondent's residence, entered the wood by a path between the residence and a neighboring house. Following a footpath through the woods, they came to two marijuana patches fenced with chicken wire. They later returned with a search warrant and seized the marijuana. *Id.* at 173–75, 104 *S.Ct.* at 1739. In delivering the Court's majority opinion, Justice Powell did an historical and contemporary analysis of the Fourth Amendment's purposes and concluded that the properties searched were open fields where an individual has no legitimate right to privacy. In

so holding, the Court eschewed any notion that an individual can establish an expectation of privacy by taking steps such as erecting fences and "No Trespassing" signs.

> The test of legitimacy is not whether the individual chooses to conceal assertedly private activity, rather the correct inquiry is whether the Government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment.... [N]or is the Government's intrusion upon an open field a "search" in the Constitutional sense because that intrusion is a trespass at common law. In the case of open fields the general rights of the property protected by the common law of trespass have little or no relevance to the applicability of the Fourth Amendment.
>
> [*Id.* at 183–84, 104 *S.Ct.* at 1744.]

The conduct of the police in *United States v. Dunn, supra,* was arguably much more intrusive than that in *Oliver* and *Thornton.* There, respondent's ranch house was situate one half-mile from a public road. Its 198 acres were encircled by a perimeter fence. Without a warrant, police crossed both the perimeter fence, an interim fence, two barbed-wire fences, and walked up to locked wooden gates in front of the barn from which they could see into the barn. Based upon their observations, they obtained a search warrant and seized evidence of the operation of a phenylacetone laboratory. *Id.* at 297–99, 107 *S.Ct.* at 1138. In reaffirming the open fields doctrine, the Court also defined the open fields concept as consisting of any unoccupied land outside the home and its curtilage.

The defendant's argument that the open fields doctrine has not been adopted by New Jersey courts is not entirely accurate. In *State v. Bonaccurso,* 227 *N.J.Super.* 159, 545 *A.*2d 853 (Law Div.1988), New Jersey D.E.P. Inspectors travelled across private lands through woods and fields before entering onto the defendant's property from where it was determined that defendant's plant was the source of unlawful discharge. The court found that the warrantless entry was statutorily permitted by *N.J.S.A.* 58:10A–6(g) (permitting entry to all premises in which a discharged source might be located). Though perhaps unnecessary, the court nonetheless addressed the open fields doctrine, citing *Oliver v. United States, supra.* In doing so, the court opined that

" . . . New Jersey would give a similar construction to Article I, Paragraph 7, of our Constitution, the analog of the Fourth Amendment, and adopt the open fields doctrine." *Id.* at 172, 545 *A.*2d 853. The court continued that New Jersey would likely give a more restrictive interpretation of the doctrine. The court declined to do so, finding instead that the doctrine, as applied to the facts of the case, permitted the warrantless search that had been made. *Bonaccurso* has been cited as standing for the proposition that there is no right of privacy in open fields. *State v. Constantino,* 254 *N.J.Super.* 259, 603 *A.*2d 173 (Law Div.1991). Similarly in *State v. Ball,* 219 *N.J.Super.* 501, 506, 530 *A.*2d 833 (App.Div. 1987), the court cited *United States v. Dunn, supra,* for the proposition that the entry of police onto private property does not always constitute a search.

Another case purporting to deal with the open fields doctrine is *Middlesex County Health Department v. Roehsler,* 235 *N.J.Super.* 262, 561 *A.*2d 1212 (Law Div.1989). There, the court held that a landfill surrounded by fencing and "No Trespassing" signs was appropriately described as an open field. The court discussed the *Oliver* and *Dunn* decisions and held that the search in its case was not violative of the Fourth Amendment or Article I, Paragraph 7, of the New Jersey Constitution. On closer scrutiny, however, the facts of that case reveal that the observations of defendant's landfill were made from the adjacent property of another. Thus, there was no actual, physical, intrusion onto defendant's land. The court's reliance on the open fields doctrine was arguably misplaced since the plain view doctrine was clearly applicable.

In sum, it is fair to say that the open fields doctrine, to a limited extent, has been applied in New Jersey. That it has not been adopted in a reported opinion of our appellate courts, makes the doctrine a less than well-settled principle under our own Constitution. Defendants rely heavily on out of state jurisdictions which have parted company with the United States Supreme Court on the open fields issue—at least where property owners have made efforts to secure their land with fencing, gates or signage. *People*

*v. Scott,* 79 *N.Y.2d* 474, 593 *N.E.2d* 1328, 583 *N.Y.S.2d* 920 (1992); *State v. Kirchoff,* 156 *Vt.* 1, 587, *A.2d* 988 (1991); *Oregon v. Dixson and Digby* 307 *Or.* 195, 766 *P.2d* 1015 (1988). However, there are also states aligning themselves with the Supreme Court of the United States and upholding the open fields doctrine. *Betchart v. California State Department of Fish & Game,* 158 *Cal.App.3d* 1104, 1110, 205 *Cal.Rptr.* 135, 139 (1984); *State v. Stokes,* 511 *So.2d* 1317, 1320–1321 (La.App. 2 Cir.1987); *State v. Paxton,* 83 *Ohio App.3d* 818, 615 *N.E.2d* 1086 (1992).

The willingness of our courts to depart from the Supreme Court of the United States for the sake of providing our citizens with greater individual rights has been amply demonstrated. *State v. Hempele,* 120 *N.J.* 182, 576 *A.2d* 793, (1990); *State v. Gilmore,* 103 *N.J.* 508, 511 *A.2d* 1150 (1986); *State v. Lewis,* 227 *N.J.Super.* 593, 601, 548 *A.2d* 231 (App.Div.1988).

The extent to which Article I, Paragraph 7, of our Constitution affords greater protection than the Fourth Amendment has been determined on a case by case basis. The court's supposition in *State v. Bonaccurso, supra.,* that New Jersey courts would give a more restrictive interpretation of the open fields doctrine is not necessarily warranted. Repeated departures from the Supreme Court of the United States by our state courts gives no presumptive validity to a claim that our Constitution would generally provide greater liberties. The issue remains factually sensitive. Departure from federal constitutional law has occurred only when it has been determined that the Supreme Court of the United States has provided New Jersey citizens with "inadequate protection against unreasonable searches and seizures." *State v. Hempele, supra,* 120 *N.J.* at 196, 576 *A.2d* 793; *State v. Hunt,* 91 *N.J.* 338, 450 *A.2d* 952 (1982); *State v. Alston,* 88 *N.J.* 211, 226, 440 *A.2d* 1311 (1981). However, in doing so the Court has also observed that "divergent interpretations are unsatisfactory from the public perspective" and only "sound policy reasons" justify a departure. *State v. Hunt, supra,* 91 *N.J.* at 345, 450 *A.2d* 952.

When determining the extent of protection provided by Article I, Paragraph 7 of the New Jersey Constitution, our Supreme Court, on occasion has also attempted to strike "a balance between the interests of the individual being free of police interference and the interests of society in effective law enforcement...."; a weighing of the "public interest being served against the nature and scope of the intrusion upon the individual." *State v. Davis,* 104 *N.J.* 490, 502–503, 517 *A.*2d 859 (1986). *See also State v. Novembrino,* 105 *N.J.* 95, 519 *A.*2d 820 (1987). At other times the Court has focused entirely on the issue of whether there exists a reasonable expectation of privacy in the area or subject matter sought to be protected by Article I, Paragraph 7, of our Constitution. *State v. Hempele, supra.*

There is substantial evidence of the public interest served in the regulation of hunting in New Jersey. This is apparent from the large body of law regulating the industry. For example, *N.J.S.A.* 23:10–20 allows any conservation officer, without warrant, to search "any boat, conveyance, vehicle, fish box, fish basket, game bag, game coat or other receptacle for game and fish" when he has reason to believe that a game, fish or wildlife law has been violated.[1] *N.J.D.E.P. v. Duran,* 251 *N.J.Super.* 55, 596 *A.*2d 1090 (App.Div.1991). *In Department of Conservation and Economic Development, Division of Fish & Game v. Scipio,* 88 *N.J.Super.* 315, 212 *A.*2d 184, (App.Div.1965), *certif. denied* 45 *N.J.* 598, 214 *A.*2d 32 (1965) the court held that hunters are

---

[1] The State has argued that "conveyance" may apply to real property since the term is defined by *Black's Law Dictionary,* 176 (5th ed. 1983) as the transfer of title to land. This construction is rejected as patently erroneous. The State has also urged that *N.J.S.A.* 13:1D–9(d) would allow the DEP to enter "any place" without a warrant. However, notwithstanding that the Division is part of the Department of Environmental Protection, it is clear that the statute is directed to the abatement of pollution, conservation of natural resources and environmental protection. While fish and game laws arguably fall within that panoply, I am not satisfied that the statute was intended to imbue conservation officers with such powers to enforce fish and game laws. Furthermore, if such authority were given to the Division of Fish & Game via *N.J.S.A.* 13:1D–9(d), *N.J.S.A.* 23:10–20 would be superfluous.

subject to hunting laws even if hunting on their own land, stating that, "The dangers to hunting are great enough to justify complete control thereof regardless of the location." *Id.* at 328, 212 *A.*2d 184.

Hunting has been said to be a dangerous activity which subjects people and domestic animals to possible injury. *Township of Chester v. Panicucci,* 62 *N.J.* 94, 102, 299 *A.*2d 385 (1973). In the unreported opinion of *State v. Dionisio,* Docket No. A–6851–93T2 (App.Div. October 1, 1996) the court described hunting as a highly regulated activity, referencing *N.J.S.A.* 23:4–42 to –48 *N.J.A.C.* 7:25–5.29 and noting the public safety concerns since it is an activity involving the use of fire arms. Finally, there is evidence in this case that over 40,000 deer are killed each year on privately-owned property in New Jersey, representing 83% of the total number of deer killed by hunters.

In conclusion, it would appear that there is strong public interest in the enforcement of laws pertaining to the regulation and control of the taking of wildlife in New Jersey, especially where it involves the use of firearms.

On the other side of the balance is the intrusion an open fields doctrine would have upon individual liberties. That determination is closely related to the issue of the reasonableness of any expectation of privacy in open fields. In discussing the open fields issue *vis a vis* the Fourth Amendment, the Supreme Court of the United States in *Oliver v. U.S., supra.* said,

> .... Open fields do not provide the setting for those intimate activities that the Amendment is intended to shelter from government interference or surveillance. There is no societal interest in protecting the privacy of those activities, such as the cultivation of crops that occur in open fields. Moreover, as a practical matter these lands usually are accessible to the public and police in ways that a home and office or commercial structure would not be.... [E]xpectation of privacy in open fields is not an expectation that society recognizes as reasonable.

> *[Id.* at 179, 104 *S.Ct.* at 1741–42.]

Likewise in *United States v. Dunn, supra.* the Court observed "the primary focus is whether the area in question harbors those

intimate activities associated with domestic life and the privacies of the home." *Id.* at 301 n. 4, 107 *S.Ct.* at 1140 n. 4.

The previously discussed evidence of the public's interest in having an open fields doctrine also cuts against the reasonableness of an expectation of privacy. Presumably the public is aware of the warrantless searches permitted by *N.J.S.A.* 23:10–20. Certainly the nature of hunting itself in open spaces, with its attendant sights and sounds would denigrate the reasonableness of anyone's claim of an expectation of privacy while engaged in such activity.

In reviewing the decisions of other states' courts limiting the open fields doctrine (as previously cited), there appear no idiosyncratic characteristics of those states underlying the rationale for disagreement with the Supreme Court of the United States.

Rather, the reason for departure appears to be simply a matter of philosophical difference. No evidence has been presented that New Jersey citizens believe that open fields are free from warrantless intrusion by government officers. A pronouncement by this court that open fields are subject to such governmental scrutiny would not likely be perceived as an erosion of individual liberties. It has been demonstrated that there are strong policy considerations in favor of the regulation and control of hunting with firearms in New Jersey. A rejection of the open fields doctrine *in toto* or the allowance of persons to escape its application by the posting of signs, fences or gates would eviscerate the State's ability to enforce its laws. To argue that the government might yet avail itself of search warrant procedures ignores the reality of the practical impediments to the effectiveness of such procedures. The nature of hunting, involving as it does vast expanses of undeveloped land, and the mobility of its participants on foot and by use of motor vehicles make it an elusive activity, requiring immediate response when violations of the law are suspected. Furthermore, it is the kind of activity, which if not subjected to "patrols", can be conducted unlawfully without serious threat of detection. It would be akin to police officers

attempting to enforce Title 39 offenses without access to public roads and highways.

■ In conclusion, I cannot say that the United States Supreme Court's decisions on the open fields doctrine provide inadequate protection for our own citizenry; or that the public policy reasons in favor of the doctrine are outweighed by the resulting intrusion upon individual liberties; or, that there are sound policy reasons for departing from United States constitutional law. Under these circumstances I am constrained to follow the lead of the Court in *Oliver, supra.* and *Dunn, supra.* and hold that the open fields doctrine applies under the facts of this case and that no violation of Article I, Paragraph 7 of the New Jersey Constitution has occurred.

Even if an *ad hoc* test were adopted by this court based upon the adequacy of efforts made to establish a right of privacy by private land owners (*see People v. Scott, supra.; State v. Kirchoff, supra.* and *Oregon v. Dixson, supra.*), defendants would likewise fail on that score. Only one means of ingress was gated and posted "No Trespassing". The access utilized by Officer Stullenberger was not far from the public road and was a dirt road itself without gates or fences and readily accessed by a hunting club bordering the property. Even though it can be said that Officers Honachefsky and Cianciulli had actual notice of the defendants' privacy claim at the entrance they utilized, any expectation of privacy must be objectively reasonable, (*State v. Hempele, supra.*) and ought not rise or fall on the fortuity of which approach to the property is utilized by government officers. The efforts made here by the owner to keep people off the property were, at best, feeble and not reasonably calculated to provide the expectation of privacy now claimed by the defendants.

■ Inasmuch as the officers' presence on defendant's property was legally permissible, all that was needed to justify the motor vehicle stop was reasonable suspicion that a law had or was being violated, *State v. Murphy,* 238 *N.J.Super.* 546, 552, 570 *A.*2d 451 (App.Div.1990) (adapting principle of law enunciated by the United

States Supreme Court in *Delaware v. Prouse,* 440 *U.S.* 648, 99 *S.Ct.* 1391, 59 *L.Ed.*2d 660 (1979)). The totality of evidence collectively known to the conservation officers at the time of the stop did amount to reasonable suspicion of unlawful activity. They had twice earlier received reports of gunshots being fired during the overnight hours over the last three days. They had located a baited deer blind on the subject property and that night observed a vehicle spotlighting and chasing deer. One of the officers saw what he thought could possibly be a rifle inside the motor vehicle. At that point they had a reasonable, articulable basis to believe the vehicle's occupants were hunting at night (a violation of *N.J.S.A.* 23:4–45(a)), and had a loaded firearm in the truck as well, (a violation of *N.J.S.A.* 23:4–24.1a). Thus, Lt. Stullenberger's attempt to stop the vehicle was lawful. In response to that attempt, defendants took flight, possibly endangering all three conservation officers in the process and thereby gave further cause for the motor vehicle stop and arrest of its occupants. *State v. Doss,* 254 *N.J.Super.* 122, 130–132, 603 *A.*2d 102 (App.Div.1992) *cert. denied* 130 *N.J.* 17, 611 *A.*2d 655 (1992).

Accordingly, the motor vehicle stop and the subsequent search of its contents was entirely justified. In conclusion, I find no violation of Article I, Paragraph 7 of the New Jersey Constitution. The motion to suppress is denied.