88 N.J. Super. 315 (1965)
212 A.2d 184
DEPARTMENT OF CONSERVATION AND ECONOMIC DEVELOPMENT, DIVISION OF FISH AND GAME, PLAINTIFF-APPELLANT, CROSS-RESPONDENT,
v.
DANIEL SCIPIO, DEFENDANT-RESPONDENT, CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued June 14, 1965.
Decided June 29, 1965.
*318 Before Judges KILKENNY, GOLDMANN and LEWIS.
Mr. Richard F. Aronsohn, Deputy Attorney General, argued the cause for appellant, cross-respondent (Mr. Arthur J. Sills, Attorney General of New Jersey, attorney).
*319 Messrs. Richard H. Steinberg and Barry R. Mandelbaum argued the cause for respondent, cross-appellant (Messrs. Irving & Barry R. Mandelbaum, attorneys).
The opinion of the court was delivered by KILKENNY, J.A.D.
Defendant was convicted in the Fairfield Municipal Court of violating N.J.S.A. 23:4-13, possession of an illegal missile, and N.J.S.A. 23:10-5, resisting arrest. On defendant's appeal to the Essex County Court, there was a plenary trial de novo. The conviction for resisting arrest was affirmed, but the conviction for possession of an illegal missile was reversed. The Division of Fish and Game in the Department of Conservation and Economic Development appeals from the County Court's judgment finding him not guilty of possession of an illegal missile. Defendant cross-appeals his conviction on the charge of resisting arrest.

I.
Defendant, by motion before oral argument, attacked preliminarily the right of the state agency to appeal the judgment of the County Court finding him not guilty of a violation of N.J.S.A. 23:4-13. We denied the motion, but without prejudice to its being renewed at oral argument when we would have before us the complete record in the case. Defendant now renews the motion, contending that a violation of the Fish and Game Law was a criminal or quasi-criminal offense, and acquittal of such a charge after a trial de novo in the County Court barred an appeal by the State.
The motion to dismiss the State's appeal is denied. Enforcement of this provision of the Fish and Game Law, N.J.S.A. 23:4-13, which subjects violators to the imposition of a "penalty of one hundred dollars ($100.00) for each offense," is not a criminal or quasi-criminal proceeding. An action under the Penalty Enforcement Act, N.J.S. 2A:58-1 et seq., to subject a person to a statutory penalty for violation of the Fish and Game Code is civil in nature. All moneys *320 recovered for violations of this law are "paid to the Division of Fish and Game for its use and purposes." N.J.S.A. 23:10-19. The law draws a distinction between a statute which subjects a violator to the payment of a "fine" or imprisonment, or both, which is deemed to be criminal or quasi-criminal in nature, and one which requires of a violator only the payment of a "penalty." The latter is regarded as one providing a civil remedy. See Sawran v. Lennon, 19 N.J. 606, 611-613 (1955), in which the above distinction is fully developed and proceedings before the municipal court magistrate to recover "the penalties prescribed for violations of the Fish and Game Law" were described as a "civil" action.
Defendant relies upon City of Newark v. Pulverman, 12 N.J. 105 (1953), where an acquittal by the County Court after a trial de novo on appeal from the Newark Municipal Court was held to preclude a further appeal by the city. That case is inapposite here because it involved an alleged violation of the municipal zoning ordinance punishable by imprisonment, fine, or both  a proceeding deemed quasi-criminal. Ibid., at pp. 113-114. We held to the same effect and for the same reason in State v. Fiore, 69 N.J. Super. 122 (App. Div. 1961), in which the Union County Court had found defendant not guilty of violating a municipal ordinance of the Township of Union, regulating itinerant food handling operations. See, too, City of Englewood v. Brewster, 77 N.J. Super. 248 (App. Div. 1962), also involving a prosecution for violation of a municipal ordinance, where the punishment could be a fine, imprisonment, or both.
The rule in Pulverman would also apply where the charge alleged a violation of the Disorderly Persons Act, N.J.S. 2A:170-1 et seq., or the commission of an indictable offense. State v. Labato, 7 N.J. 137 (1951); State v. Hart, 90 N.J.L. 261 (E. & A. 1917); State v. Smith, 21 N.J. 326 (1956). The rationale behind the rule is the guarantee against "double jeopardy." New Jersey Constitution (1947), Article I, paragraph 11. But the protection against double jeopardy is limited to criminal and quasi-criminal proceedings. *321 Atkinson v. Parsekian, 37 N.J. 143, 154 (1962); State v. Hatterer, 75 N.J. Super. 400, 403 (App. Div. 1962). It is inapplicable to civil actions, as here, for the recovery of statutory penalties under the Fish and Game Law.
In support of his contention that violations of the Fish and Game Law are quasi-criminal in character, defendant urges upon us that this statute authorizes arrest of violators, N.J.S.A. 23:10-5; immediate search of persons and seizure of property, and also issuance of search warrants for "probable cause," N.J.S.A. 23:10-20. It further provides for jurisdiction in the municipal courts "to try and punish any person violating any provision of this title," N.J.S.A. 23:10-2; trial of offenses in a summary manner, N.J.S.A. 23:10-2; imprisonment of persons found guilty who fail to pay the penalty imposed, R.S. 23:10-14, and the placing of convicted persons on probation, N.J.S.A. 23:10-15.
We recognize that these procedures are normal concomitants of criminal and quasi-criminal proceedings. But the extension of their use in aid of the enforcement of the Fish and Game Law does not thereby convert an action for the recovery of penalties thereunder from a civil proceeding, as recognized by our Supreme Court in Sawran v. Lennon, supra, to one of a criminal nature.
The arrest of persons in some instances at the inception of a civil action, and the use of a body execution as a means of enforcing collection of a money judgment through the medium of the writs of ne exeat, capias ad respondendum and capias ad satisfaciendum, are an established part of our civil practice. N.J.S. 2A:15-41 and 42; N.J.S. 2A:17-78 and 79; R.R. 4:66. Therefore, the mere fact of arrest is not inconsistent with the pursuit of a civil remedy. As we also said in Department of Labor and Industry v. Rosen, 44 N.J. Super. 42 (App. Div. 1957):
"The fact that a penalty statute provides for enforcement by body execution in the event of failure to pay the penalty is not conclusive of the nature of the proceeding as being either criminal or civil. Enforcement provisions for non-payment of penalties are frequently *322 found in civil penalty statutes. Cf., State Board of Medical Examiners v. Kornreich, 136 N.J.L. 367 (Sup. Ct. 1948); Lowrie v. State Board of Dentistry, 90 N.J.L. 54 (Sup. Ct. 1917)." (at p. 48)
Sawran v. Lennon, supra, 19 N.J., at pp. 615-616, expressly noted that an action for the enforcement of a penalty under the Fish and Game Law was a civil proceeding despite its hybrid character, starting with a complaint (resembling a criminal complaint, R.R. 7:13-2) and ending with a judgment of conviction (R.R. 7:13-10), and providing for execution against the body of defendant on a civil capias if the court specially orders. See N.J.S. 2A:58-4.
R.R. 7:13, pertaining to "Procedure for Collection of Statutory Penalties," falls within that part of our rules entitled "Rules Governing Civil Practice in the County District Courts and Municipal Courts." See, too, R.R. 4:89 of the Rules of Civil Practice extending the provisions of R.R. 7:13 to the Superior Court. Compare Part VIII of the rules, entitled "Rules Governing Practice in the Local Criminal Courts." Note the references, too, in R.R. 7:13 to violations of Title 23, Fish and Game, as in R.R. 7:13-3, 4 and 6A. See also R.R. 5:2-1 governing "all matters of a civil nature" in the County Court and R.R. 5:2-6, relating to collection of penalty actions. These rules make it manifest that proceedings to recover statutory penalties are civil in nature.

II.
It follows, then, that civil proceedings to recover a statutory penalty do not require proof beyond a reasonable doubt that the accused transgressed the law. The State satisfies the burden of proof placed upon it if it establishes defendant's violation by a preponderance of the evidence. State v. Cale, 19 N.J. Super. 397, 399 (App. Div. 1952). In this respect, the County Court erred in finding defendant not guilty of possession of an illegal missile while hunting, N.J.S.A. 23:4-13, merely because the state agency had not proved *323 to the court's satisfaction, defendant's guilt beyond a reasonable doubt.
We are satisfied, as was the municipal court, and as the County Court might well have been if the preponderance of evidence test had been applied, that plaintiff state agency did prove by the requisite quantum defendant's guilt of violating N.J.S.A. 23:4-13. That section of the Fish and Game Law provides:
"No person shall use in hunting any fowl or animals of any kind any firearm except as permitted by the provisions of the State Fish and Game Code, or, in the absence of such provision in said code, except a shotgun being not larger than ten gauge, and capable of holding not more than two cartridges at one time, or that may be fired more than twice without reloading, or use a silencer on any firearm when hunting for game or fowl, under a penalty of twenty dollars ($20.00) for each offense; provided, however, that the division in its discretion may issue permits for the use of a rifle for shooting woodchucks only. No person shall have any missile larger than as permitted by the provisions of the State Fish and Game Code, or, in the absence of such provision in said code, larger than number four shot in possession in the woods or fields at any time other than during the open season for killing deer, under a penalty of one hundred dollars ($100.00) for each offense." (Italics ours)
Defendant was charged with violation of the above italicized portion of this statute on October 31, 1964.
The trial record discloses the following. On the date in issue, Patterson and Bretinger, employed as conservation officers by the Fish and Game Commission, dressed in their field uniforms and hunting jackets which contain no badges or insignia, and on routine patrol in Fairfield Township, heard through the open windows of their automobile two shots, which seemed to them to have come from a high-calibre, small-arm weapon. They stopped their car and then heard a third shot of the same kind. Both men had many years of experience in firearms. The officers then entered a heavily wooded area, where the shots had apparently been fired. This area had recently been stocked by the Division of Fish and Game with pheasants. They observed two men walking perpendicular to the highway  one armed with a bow and arrow, who *324 had a hunting tag on his back, while the other (defendant) "had a shotgun and no tag visible." Both men "were looking around up into the trees and on the ground."
Patterson announced that they were conservation officers and asked to see defendant's credentials. He said he had no hunting license and that he needed none to hunt on this property because it belonged to his father. Suspecting a violation of the law, Patterson asked to see defendant's shotgun, but he refused the request and resisted Patterson's effort to take hold of it. However, Patterson managed to twist it from his grasp. In the struggle, defendant's hunting coat opened and the officers saw on defendant's right hip a holstered pistol. According to Patterson, defendant threatened to kill him if he took the pistol. In the continuing struggle, and while Patterson had his hands on defendant to prevent him from drawing the pistol, Officer Bretinger removed Patterson's wallet from his pocket and showed defendant Patterson's badge and credentials. According to Patterson, defendant would not accept the credentials and continued to struggle. Finally, Patterson "managed to twist the pistol from his grasp and from his holster * * * opened it and removed nine twenty-two calibre cartridges from a six inch barrel high standard revolver." Such cartridges are larger than the legal limit of number four shot.
Patterson testified that defendant then turned and rapidly walked away. Patterson caught up with him, noticed a bulge in his hunting coat and withdrew two dead squirrels from under the coat. Defendant again moved away and trotted toward the highway. Patterson chased after him and grabbed his arm. Then, as Patterson expressed it:
"He pulled away from me. I kept onto him, but he kept dragging me across the road. He said he was not going to do it, that he was not going with me and I could not place him under arrest because I had no authority and he did not violate any law. I told him that he was under arrest, that I could not release him, that he had to come with me. I explained my position to him, that I was an arresting officer. He calmed down. I placed him in the automobile and took him to Fairfield Township Police Department." *325 In further elaboration of his efforts to arrest defendant, Patterson testified on redirect examination that, after announcement of his arrest, defendant "pulled his arms back, as though to strike, pulling away violently, pulling away and dragging me with him and trying to get away."
Patterson's testimony was corroborated by his associate, Bretinger. The latter added that the shots which they originally heard were from a high-calibre missile. However, his examination of the squirrels revealed that they had been killed with bird shot and not with .22 calibre missiles.
Defendant testified in the County Court that he had gone out with a shotgun to kill some small animals which had been invading his father's corn crop, and had brought the pistol and cartridges along solely to do some target shooting. He stated that he had put up a small target in the woods and had fired at it several times with the pistol. A target was introduced into evidence, defendant alleging that it had been in his pocket when he was arrested. He claimed that he told Patterson he had used the pistol only for target shooting. Defendant denied resisting the officer after the latter had produced his credentials.
Joseph Lamoglia, the hunter in the woods with the bow and arrow, testified that he had come upon defendant just before the officers. Although he had seen defendant target shooting in the past, he saw no target at the time in issue and heard no mention by defendant about target shooting. Lamoglia stated that defendant did not resist after he had seen Patterson's credentials.
The County Court interpreted N.J.S.A. 23:4-13 as requiring for conviction not only that defendant must be in possession of the unlawful missile, but also that he must be in possession of it "while hunting" and for the purpose of actually using it in hunting. The County Court found, and defendant concedes, that he was in possession of the pistol and the .22 calibre cartridges  missiles admittedly in excess of the Fish and Game Code limit  "while hunting." But the County Court had some doubt as to whether defendant had *326 the pistol and cartridges for target shooting only, as he said, rather than for hunting, and on that basis alone it found defendant not guilty of this charge, acting under the mistaken belief that the proof must be beyond a reasonable doubt.
The Division of Fish and Game maintains that mere possession of the unlawful missiles justifies a conviction, regardless of whether the person was in possession of them "while hunting" or had them for the purpose of actually using them for hunting. While unnecessary for our decision because it is unquestioned that defendant was in possession of the pistol and cartridges "while hunting," we would hold, were it necessary to do so, that N.J.S.A. 23:4-13 was intended by the Legislature to apply to persons while hunting. The caption of this section reads: "Manner, Means and Times of Hunting." (Emphasis added) Though not controlling, the caption is some indication of the legislative purpose.
At one time the provision relating to possession of larger than No. 4 shot was part of R.S. 23:4-44. In 1946 the Legislature added the offense of possession of an illegal missile to R.S. 23:4-13. L. 1946, c. 50. The statement accompanying the bill gave as a reason therefor: "To put into one section all references to legal firearms and missiles." The title of the 1946 act was "An Act regulating firearms to be used in hunting, and amending section 23:4-13 of the Revised Statutes." The reference to "hunting" is noteworthy. So, too, the first sentence in N.J.S.A. 23:4-13 begins as follows: "No person shall use in hunting any fowl or animals of any kind any firearm except as permitted by the provisions of the State Fish and Game Code * * *." (Italics ours) Thus, again, the emphasis is on "hunting." The subsequent clause in N.J.S.A. 23:4-13, relating to "missiles," must be referrable to a firearm capable of being used in hunting. The Legislature was hardly proscribing mere possession of a missile unaccompanied by a firearm capable of discharging it, while a person was hunting. The 1964-65 State Fish and Game Code, referring to sections 23:4-13 and 23:4-44, reads as follows:
*327 "Illegal for any hunter to have in his possession in the woods, fields, marshlands or on the water, any shell or cartridge with missiles of any kind larger than No. 4 fine shot except during the firearm deer season * * *." (Italics ours)
The narrower question is whether N.J.S.A. 23:4-13 covers a situation where a person is actually hunting (as was defendant here, having already shot two squirrels), and in possession in the woods and fields where he is hunting of missiles larger than No. 4 fine shot and a weapon to discharge them (as defendant admittedly was even though it was not the deer season), if defendant's subjective intent is to fire the missiles at a target only, as he says.
We conclude that the legislative intent was to forbid a person from having in his possession the prohibited missiles while hunting, despite his claim that he intended to use them only for a purpose other than hunting, such as target shooting. Were that not so, enforcement of the provision relating to possession of unlawful missiles would be practically impossible. The person in possession could always claim that he had the missiles only for target practice. Or he might even claim that although he had such missiles, he never intended to use them for hunting. Prosecution then would generally require proof of the use of the unlawful missiles. We are satisfied that if the Legislature intended to prohibit the use of such missiles, rather than mere possession, it would have plainly so stated. By banning the possession of the unlawful missiles while hunting, the potentiality of a person's using them for hunting purposes, despite his avowed purpose to the contrary, is removed and thus the conservation policy of protecting humans and wild life is furthered. So interpreted, it is clear that defendant violated N.J.S.A. 23:4-13 and was subject to the penalty of $100 fixed by the statute for this offense.
Moreover, we place no credence in defendant's claim that he was out target shooting. The officers saw no target and they swore that defendant made no mention of it when he was apprehended. They further testified in the County Court *328 that defendant made no mention of target shooting during the trial in the municipal court. If he had the target in his pocket when he was apprehended, why did he fail to say so at that time? Why did he put up such a struggle for possession of the pistol if it were being used for such an innocuous purpose? The credible evidence demonstrates that defendant told his story of target shooting for the first time in the County Court. His witness, Lamoglia, who was present at the time in issue, heard no reference then by defendant to target shooting, despite defendant's assertion that he so told the officers. The three shots heard by the officers were from a high-calibre gun, immediately following which they came upon the scene and saw defendant and his companion "looking around up into the trees and on the ground." This is inconsistent with target shooting. There was no target visible in the area. Defendant confirmed this when he said he had it in his pocket. Defendant was in an area recently stocked with pheasant. The two squirrels found upon his person, though evidently shot with the shotgun, demonstrate that he was out hunting. The preponderance of the evidence rejects as incredible defendant's belated story about target shooting. One would hardly go into a thickly wooded area for that purpose. Were it necessary to find that defendant had the pistol and cartridges for the purpose of hunting, the probabilities engendered by the preponderance of the evidence would compel us to so find.
There is no merit in defendant's additional claim that the law does not apply to a person on his own property. The Fish and Game Law applies to all hunters, whether or not they own the land upon which they hunt. The dangers incident to hunting are great enough to justify complete control thereof, regardless of the location. See Cozy Pine Hunting Preserve, Inc. v. Fish and Game Division, 87 N.J. Super. 84 (App. Div. 1965), certification denied 45 N.J. 160 (1965); Rice Hope Plantation v. South Carolina Public Service Authority, 216 S.C. 500, 59 S.E.2d 132 (S.C. Sup. Ct. 1950); 38 C.J.S., Gaming § 4 (1943). All N.J.S.A. *329 23:3-1 does is to exempt farmers from the requirement of securing a license for hunting on their own lands. Defendant was not charged with hunting without a license.

III.
The evidence amply supports the finding by the County Court that defendant was guilty of resisting arrest, in violation of N.J.S.A. 23:10-5. The municipal court made a similar finding. As indicated above, defendant put up strenuous resistance both prior to and following his arrest, as well as prior and subsequent to verbal announcement of the arrest. This factual issue was properly resolved against him by both tribunals.
Defendant argues that the arrest was unlawful and, therefore, he was justified in resisting arrest. N.J.S.A. 23:10-5 empowers a conservation officer to arrest without a warrant for violation of the Fish and Game Law "committed within the view of any such officer." The officers did see defendant in possession of the unlawful missiles and had a right to arrest for that violation committed within their view, as was done.
There is no need to decide herein to what extent, if any, defendant might have been legally justified in resisting arrest, if he were not in fact guilty of the underlying offense. But see State v. Smith, 37 N.J. 481, 494-495 (1962), certiorari denied 374 U.S. 835, 83 S.Ct. 1879, 10 L.Ed.2d 1055 (1963), and People v. Burgess, 170 Cal. App.2d 36, 338 P.2d 524 (Cal. D. Ct. App. 1959).
The judgment of the County Court finding defendant guilty of resisting arrest, N.J.S.A. 23:10-5, is affirmed.
The judgment of the County Court finding defendant not guilty of the possession of unlawful missiles, N.J.S.A. 23:4-13, is reversed and the matter is remanded to the County Court for the entry of judgment against defendant for the penalty of $100, as provided by that statute.