866 A.2d 242 (2004)
375 N.J. Super. 24
STATE of New Jersey, Plaintiff,
v.
Joseph BRADLEY, Defendant,
Superior Court of New Jersey, Law Division, Criminal Part, Cape May County.
Decided October 26, 2004.
*243 Neil D. Magnus, Deputy Attorney General for the State.
Robert P. Becker, Jr., Woodbury, for defendant.
BATTEN, J.S.C.
In this de novo appeal from the dismissal of a penalty enforcement complaint filed by the Division of Fish and Wildlife, N.J.S.A. 2A:58-10 to 2A:58-12, this court must determine, on first impression, whether an unloaded "socked" shotgun shouldered by a licensed deer "driver" bearing no shells, subsequent to the harvest and "tagging"  yet prior to registration  of his first deer, is "readily usable", as referenced in our statutory definition of "hunting". N.J.S.A. 23:1-1. If so, the defendant's return to a deer drive under those circumstances constitutes "hunting" and therefore, claims the Division, a clear violation of N.J.S.A. 23:4-42 and N.J.A.C. 7:25-5.27(e) and, as more specifically alleged in the complaint, an unlawful "attempt to take more than the daily bag limit of white-tailed deer". If not, as the municipal court below determined, the defendant was not then hunting; neither statute nor administrative regulation has been violated and the defendant remains entitled to dismissal of the complaint. Preliminary overview of applicable law is helpful.
The possession and use of weapons in New Jersey is highly regulated and those who possess and use weapons are held to the highest standards. State v. Pelleteri, 294 N.J.Super. 330, 335, 683 A.2d 555, 558 (App.Div.1996). Known possession of a rifle or shotgun "without having first obtained *244 a firearms purchaser identification card" as required by N.J.S.A. 2C:58-3 is a third degree crime. N.J.S.A. 2C:39-5c. A person "carrying a firearm... in the woods or fields ... of this State for the purpose of hunting" must have "... in his possession a valid hunting license". NJ.S.A. 2C:39-6f(2). No person shall "hunt for, pursue, shoot at, take, kill, wound or attempt to take, kill or wound a deer of any description ..." except as permitted by the State Fish and Game Code ("Code"), adopted pursuant to N.J.S.A. 13:1B-30 et seq., or otherwise "... kill in any one year more than the number of deer permitted" by the Code. N.J.S.A. 23:4-42. Additional restrictions also pertain to the hunting of deer. Most relevantly,
A person who kills a deer in this State at any time during the legal seasons shall immediately attach thereto the deer transportation tag supplied with the hunting license and shall transport the deer to a deer checking station before 7:00 P.M. on the day said deer was killed, for registering the kill and having a legal possession tag affixed, which possession tag shall remain attached until the carcass has been consumed.
[N.J.S.A. 23:4-47 (emphasis added).]
Failure to properly tag a deer and transport the deer to a checking station maintained and operated by the Division of Fish and Wildlife, Department of Environmental Protection ("Division") subjects the violator to a penalty of "... not less than $100 nor more than $500 for the first offense and not less than $300 nor more than $1,000 for the second and each subsequent offense". N.J.S.A. 23:4-48.
The date here in question, December 8, 2003, was actually the first day of "white-tailed deer six-day firearm season", N.J.A.C. 7:25-5.27(a), more colloquially known as "buck week". The "bag limit" is "two antlered deer, with antler at least three inches long", per hunter. N.J.A.C. 7:25-5.27(b). The Code precludes hunting for such deer prior to procurement of a "transportation tag" ("tag") appropriate for the season. Ibid. The initial tag is issued by the Division contemporaneous to its issuance of a hunting license. One "supplemental deer transportation tag" ("supplemental tag") is issued only "upon completion of the registration of the first deer", whereupon the licensed holder may "continue hunting and take one additional deer with antler at least three inches long during the current six-day firearm season". Ibid. Fair reading of these provisions suggests that hunting subsequent to the harvest and tagging of the first deer yet prior to satisfaction of the registration requirements and consequent issuance of the supplemental tag is prohibited if for no other reason than the immediate tagging requirement that is triggered by any harvest of a second deer. While the Code contains no such express language, its more general prohibition so suggests: "No person shall take, attempt to take, hunt, kill or attempt to kill, shoot at or attempt to shoot at, in any one day or in any one year, more than the number of deer permitted by this Code." N.J.A.C. 7:25-5.27(e).
Alleged violations of the fish and game laws are adjudicated in municipal court pursuant to the Penalty Enforcement Act of 1999, N.J.S.A. 2A:58-10 to 2A:58-12, and, as civil proceedings to recover a statutory penalty, invoke the civil burden of proof, i.e. the preponderance of credible evidence. Department of Conservation and Economic Development, Division of Fish and Game v. Scipio, 88 N.J.Super. 315, 319-320, 212 A.2d 184, 186 (App.Div.1965). The right of appeal therefore lies from municipal court decisions unfavorable to the Division; hence, this *245 appeal. Ibid.; State v. Meinken, 10 N.J. 348, 91 A.2d 721 (1952).
The facts, as adduced in the record before the municipal court, are these:
On the morning of December 8, 2003, approximately thirty-five members of the Louis Reuter Deer Club ("club"), a hunting club hailing for more than fifty years from Richwood, Gloucester County, arrived at a wooded area bounded by Narrows Road in a remote section of Upper Township, Cape May County. At some point between sunrise and the alleged violation at 9:00 A.M., defendant Joseph Bradley ("defendant")  a duly licensed hunter and member of the club for twenty-six years  legally "harvested" his first deer on either the first or second "drive" of the morning.[1] He immediately "... tagged it ... put it in the truck ... filled out the transportation tag that's required to be put on a deer ... and my license, I left on the deer because I was done hunting ... from there, ... did drives, cased the gun, no shells."
He followed that process, consistent with the long-standing practice of the club because, he acknowledged, "... you can't hunt another one until it's legally checked in". He did not immediately register the deer at the check-in station because "... with the group of us ... an amount of 30, 40 guys, 3 trucks ... it's not feasible just for somebody to take the truck and leave the other people stranded". Instead, those hunters having harvested deer "... go in at lunch time and check them in"; meanwhile, "... whoever kills the deer will be a driver". "You shoot a deer", he explained, "you're done till it's checked in".
Importantly, the defendant cased his shotgun and surrendered all of his remaining shells prior to his return to the drive: "I had given them to another hunter, ... after I had harvested that deer, that's when I gave him the shells. He was short a few shells."
He shouldered his cased shotgun for the return to the drive, he further explained, because "... there is no way I'm leaving an unattended gun in a vehicle".
The shotgun case here utilized is a nylon "sock" with "a tie string on the end". Removal of the gun from the case is therefore "... not a very difficult procedure". The fact and characteristics of the "sock" case are not unusual, however. Indeed, Division Conservation Officer Zane Batten ("Batten") testified, on direct examination, that:
... the gentlemen that are let out initially to drive the other vehicles have to be transported back to the vehicle they left. To have their guns cased, they must have a case with them when they get to the end of a drive so they can be transported back to the original vehicle. It's common for most hunters to carry a gun case with them, which is nothing more than a nylon or cotton-type sock that slips over the gun.[2] *246 Defendant's intent was to not "... in any way hunt deer during that drive" Even had he intended otherwise, he explained, shooting a deer under the described circumstances would not have been possible, and for several reasons. First, he possessed no shells. Second, the typical distance between "drivers" on a deer drive  "50 to 60 yards" precludes the sharing of shells between drivers. Indeed, "...during a drive you're not close enough". Third, preparation for firing a shotgun both unloaded and cased would have required removal of the encased gun from his shoulder, removal of the gun from the case, procurement of shells from another driver not less than 50 yards away, loading of the shell(s) in the shotgun prior to firing, and then, assuming that the deer remained in both sight and range, aiming and firing, a cumbersomeprocedure not likely to have been achieved prior to flight by wild deer. The defendant further acknowledged the abject illegality of any attempt by him to hunt on a drive while his hunting license remained with his harvested deer. N.J.S.A. 2C:39-6f(2).
Upon conclusion of the third "drive" following his harvest, defendant observed Batten in the vicinity of the parked truck containing his tagged deer and hunting license. Defendant immediately walked from the woods to Batten:
... I walked out to the officer ... I know they're looking for who shot the deer, which is typical. They want to check and make sure the guy's not hunting. Walked right out to him and he asked me why did you think I was looking for you? `Because I shot the deer, I know that'. I said, `I've got no shells, gun cased, and I'm not leaving a gun in an unattended vehicle.... we're checking it in ... at lunch. I even left my license on there'.
While defendant acknowledged that he could have left his shotgun with another hunter who remained at the trucks, Batten also acknowledged that the "sock" case was "... legal for transporting a gun to and from home". Indeed, Batten had "no doubt" that defendant "wasn't in the field walking with another license or with a license and carrying a loaded weapon". Batten also acknowledged no factual basis "... to doubt that the defendant was driving deer, walking with other members of the club and carrying a cased weapon". Batten did not see the defendant either "take" or "attempt to take" a second deer yet claims to have seen him "hunting or attempting to hunt another deer", based upon him "... carrying this  this cased gun in the woods with no shells on him ... correct". Batten further acknowledged the absence of any governmental regulation defining "hunting" as "carrying a cased gun in the woods with no shells". In fact, Batten did not see defendant's gun outside of the case at any time. He nonetheless charged the defendant with attempting to hunt because he returned to the woods as a driver prior to registration of his first, tagged, harvested deer, leaving him without a supplemental transportation tag for any second deer subsequently hunted and harvested.

I. The Complaint Summons

On December 9, 2003, Batten charged the defendant with the December 8, 2003, violation of N.J.S.A. 23:4-42 as pertains to N.J.A.C. 7:25-5.27(e). The former provides, in pertinent part, that: "... no person shall ... kill in any one year more than the number of deer permitted *247 by the State Fish and Game Code." N.J.S.A. 23:4-42. (emphasis added).
The latter similarly provides, in pertinent part, that: "No person shall take, attempt to take, hunt or attempt to hunt, kill, shoot at or attempt to shoot at in any one day or in any one year, more than the number of deer permitted by this code." N.J.A.C. 7:25-5.27(e) (emphasis added).
Specifically, the complaint alleges that defendant "... did attempt to take more than the daily bag limit of white tailed deer". This narrative, as applied to this record, is troubling for several reasons.
First, neither statute nor Code establishes a "daily bag limit of white tailed deer" during buck week. The only bag limit is the seasonal  as opposed to daily  limit of two deer per licensed hunter. N.J.A.C. 7:25-5.27(b).
Second, the defendant has not exceeded even the seasonal bag limit for white-tailed deer. He tagged his first and only harvest, cased his shotgun, surrendered all shells, removed his hunting license, and proceeded to "drive" throughout the balance of the morning pending (1) the intended registration of his deer at the nearest deer checking station during the lunch break and (2) receipt of a supplemental tag for any second deer thereafter harvested.
Third, any claim that defendant violated a bag limit by driving deer through woods under these circumstances  distinct from excessive harvests  lacks both factual and legal basis. Factually, again, the defendant harvested but one deer. Legally, neither statute nor regulation precludes the "driving" of deer by a hunter subsequent to first harvest yet prior to registration. To the contrary, our regulatory scheme fails to impose any time requirement upon hunters of legally harvested deer except (1) immediate attachment of a transportation tag to each harvested deer,[3] and (2) registration of each harvested deer by 7:00 P.M. on the day of harvest.[4] The *248 State does not claim that defendant failed to either "immediately attach ... the deer transportation tag", N.J.S.A. 23:4-47, or "transport the deer to a deer checking station before 7:00 P.M. on the day [it] was killed". N.J.A.C. 7:25-5.27(b).
The "attempt to take" alleged by the State in its complaint therefore bears neither factual nor legal relevance to violation of any seasonal bag limit specified in either statute or regulation and, on these facts, only relates  if just arguably  to the potential harvest of a second white-tailed deer prior to the receipt of the supplemental tag. Concededly, the harvest of a second deer by a hunter not in possession of a supplemental tag would render its immediate attachment to the deer impossible, a violation of N.J.S.A. 23:4-47. Any such failure to tag a deer immediately would subject that hunter to penalties authorized by N.J.S.A. 23:4-48.[5] The Division, here, makes no such claim nor can it in the absence of a second harvest.
At most, then, defendant, if actually proven to have "attempt[ed] to take" a second deer, has violated neither bag limit nor registration requirement but, instead, the unstated albeit arguably implied requirement that every hunter, at all times when actually hunting, maintain a present capacity to "immediately attach" a deer transportation tag (or supplemental tag, as the case may be) to a deer upon harvest. N.J.S.A. 23:4-47. Neither the statutes nor the Code expressly so require, and presumably for good reason.
The duty to tag immediately arises only upon the harvest itself. Ibid. While the prospect of deer hunting without physical possession of the appropriate transportation tag or supplemental tag may be the Division's actual concern here, the prospective failure to tag a deer yet unharvested is not, at present, an offense. Ibid. Legislation requiring deer hunters to maintain physical possession of the appropriate transportation tag at all times when hunting would more certainly clarify the law and cure the apparent concern of the Division. This case must be decided, however, by application of the regulatory offenses charged in the complaint, not what and when other the law might better be. On that score, the record below contains no evidence that the defendant (1) "... killed in any one year more than the number of deer permitted" by the Code, N.J.S.A. 23:4-42; (2) took, attempted to take, hunted or attempted to hunt, kill, shoot at or attempted to shoot at "in any one year, more than the number of deer permitted by this code", N.J.A.C. 7:25-5.27(e); or (3) "... did attempt to take more than the daily bag limit of white-tailed deer", as narratively alleged in the complaint.
As such, the Division has failed to prove by any quantum of evidence that the defendant has violated any one or *249 combination of the statutory, regulatory and narrative offenses alleged. Dismissal is warranted for yet another and more basic substantive reason, however. The defendant, when apprehended by the Division under circumstances confirmed in this record, was not "hunting" as defined in N.J.S.A. 23:1-1 because his shotgun was not then "readily usable".

II. Hunting

Unqualified testimony by Batten that the defendant neither "shot" nor "killed", nor did he "attempt to shoot" or "kill", a second deer reduces the Division's actual claim, in the remaining language of N.J.A.C. 7:25-5.27(e), to "taking", "hunting", or the "attempt" at either. Accepting in pari materia the statutory definition of "taking" found in our Hunter Harassment Statute, i.e. "to hunt ...or to attempt to hunt ... wildlife", N.J.S.A. 23:7A-1, this case further and ultimately distills to a determination of whether this defendant was either "hunt[ing] or attempt[ing] to hunt ..." at the time of his apprehension by the Division. See Binkowski v. State, 322 N.J.Super. 359, 378, 731 A.2d 64, 74 (App.Div.1999). Careful consideration is warranted.
Until recently, the hunting of wildlife, long the subject of common law in New Jersey, had been defined, generally, as "the act of searching for, pursuing or chasing game", State v. Meinken, supra, 10 N.J. at 353, 91 A.2d at 723, and, more specifically, as:
(1) physical presence in an area where game is believed to be or may be expected to be found;
(2) possession of the necessary equipment with which to capture or kill game; and
(3) the intention of capturing and killing game if and when the opportunity presents itself.

Ibid. [Emphasis added.][6]
Such presence, possession and intent remained the conjunctive elements of hunting for the forty-six years next following Meinken.
In 1998, our Legislature amended the statutes to include, for the first time, the definition of "hunting": "... the possession of an instrument used to take wildlife in a condition that makes the instrument readily usable, while in a place or in proximity thereto where wild life may be found." N.J.S.A. 23:1-1. (emphasis added).
Retaining the elements of both presence and possession from the common law calculus, the Legislature notably  and importantly  substituted for subjective intent "to capture and kill", Meinken, supra. 10 N.J. at 353, 91 A.2d at 723, the objectively measured "condition" of "an instrument used to take wildlife". N.J.S.A. 23:1-1. As a result, intent is no longer the sine qua non to hunting; the critical inquiry  beyond presence and possession  is whether the "instrument" is "readily usable". Ibid. Here, the defendant readily acknowledges both presence "... in a *250 place ... where wildlife may be found" and his "... possession of an instrument used to take wildlife" when apprehended by the Division. He vigorously disputes, however, the Division's claim that his shotgun was then "readily usable". Ibid. He was not, he claims, hunting.
Again, this record is problematic to the Division.

"Readily Usable"
The term, "readily usable", as applied to hunting or any other object, lacks statutory, regulatory or reported decisional definition in New Jersey. States other than New Jersey conspicuously omit the term from their statutory definitions of "hunting".[7] Few foreign courts have had opportunity *251 to construe the term as relates to weapons.
In State v. Goltz, 169 Or.App. 619, 10 P.3d 955 (2000), the Oregon Court of Appeals, denying the defendant's motion for acquittal on charges of aggravated murder and felony possession of a firearm, adjudged that a jury might characterize as "readily usable" a dissembled firearm which required "very little time ... to make it capable of firing". Id. at 622, 10 P.3d 955. There, however, the defendant was found to possess  unlike this defendant  ammunition susceptible of near-immediate placement in the weapon. Here, by contrast, the shells surrendered by the defendant to a colleague prior to his return to the drive render an otherwise properly operable shotgun not "readily usable". In Wesolic v. State, 837 P.2d 130 (Alaska Ct.App.1992), the Alaska Court of Appeals adjudged a dissembled weapon in a sealed crate not "readily usable" because the owner was neither prepared nor planning to shoot his shotgun. Admittedly, a sealed crate seized beyond the hunting field differs significantly from the nylon sock that here encased defendant's shotgun. The rationale of Wesolic, however, supports no less than Goltz the important statutory distinction between usability and operability of a weapon.
In New Jersey, only one statute contemplates a "readily usable" gun. N.J.S.A. 23:1-1. Two statutes contemplate "inoperable" weapon(s). N.J.S.A. 2C:39-5(f) (unlawful possession of assault weapons); N.J.S.A. 2C:58-13(c) (transfer of assault firearm to another; rendering inoperable). The latter defines "inoperab[ility]" as the condition whereby "the firearm is altered in such a manner that it cannot be immediately fired and that the owner or possessor of the firearm does not possess or have control over the parts necessary to make the firearm operable". Ibid. Weapon inoperability and its component elements (including mechanical alteration) were presumably known to our Legislature in 1998 when it otherwise defined hunting, adopting instead the "readily usable" standard.[8] Operability  or, conversely, inoperability, in the language of N.J.S.A. 2C:58-13(c)  therefore references the mechanical capacity of a gun to fire and control over the gun whereas "usab [ility]", as contemplated by the text of N.J.S.A. 23:1-1, most logically relates to environmental circumstances beyond operability and control such as, in this court's view, circumstances attendant to possession of the gun.
On this analysis, mere presence and possession of a gun readily operable is not "hunting" in New Jersey; presence and possession of a gun "readily usable" is. Stated otherwise, an operable gun is not necessarily "readily usable". This distinction, on these facts, is determinative. The defendant's shotgun, at the time of apprehension by the Division, may well have been readily operable but it was not "readily usable" while fully and legally encased and shouldered by a deer driver having surrendered all of his shells to another driver situate not less than fifty yards away. That shotgun, as even Batten corroborated, was not then ready for use.
Attribution of even the most common meaning to the phrase, "readily usable", yields the same conclusion. For example, *252 Black's Law Dictionary defines "ready" as: "Prepared for what one is about to do or experience; equipped or supplied with what is needed for some act or event; prepared for immediate movements or action. Fitted, arranged, or placed for immediate use; causing no delay for lack of being prepared or furnished." Black's Law Dictionary, 1136 (5th ed. 1979). (emphasis added).
The verb "use" is therein defined as: "To make use of, to convert to one's service, to avail one's self of, to employ." Id. at 1381. (emphasis added).
When transposed to their adverbial and adjectival contexts respectively and construed together, the phrase, "readily usable", is most obviously construed to mean susceptible of or equipped for immediate use, action or employment. By this definition, defendant's shotgun  fully and legally cased and shouldered by a man carrying not a single shell  while readily operable, was not then "readily usable".
The defendant, as a result, cannot now properly be found by even a preponderance of the credible evidence to have then been hunting or attempting to hunt. A contrary conclusion would subject virtually every legally licensed gun owner transporting by any means  and with no shells in his possession  a lawfully purchased, fully encased gun in proximity to any place where wildlife may be found, to a charge (or charges) of unlawful hunting, a scenario which, if truly sought to be rendered criminal or otherwise unlawful by our Legislature, could have been  and, presumably, would have been  statutorily proscribed. The failure of either statute or administrative regulation to so declare is most revealing to this court, particularly given the degree of attention paid by both Congress and our Legislature to gun ownership on both federal and state levels in recent years. See Violent Crime and Law Enforcement Act of 1994, 18 U.S.C.S. §§ 921-922, 924(a)(1)(B); N.J.S.A. 2C:39-1 to 2C:39-16.
The defendant's shotgun was not, at the time of his apprehension, "readily usable"; he could not, then, have been "hunting". N.J.S.A. 23:1-1. Even if logic is strained to a contrary conclusion, he was duly licensed to own and possess his weapon and hunt during buck week. N.J.S.A. 2C:58-3; 2C:39-6f(2); N.J.A.C. 7:25-5.27(a). He violated no bag limitation. N.J.A.C. 7:25-5.27(b). Finally, he violated neither registration requirement for the harvested deer, N.J.S.A. 23:4-47, nor tagging requirement inapplicable to a deer never harvested. Ibid., N.J.A.C. 7:25-5.27(b).
Final Judgment dismissing the Division's complaint must therefore issue, and hereby does.
NOTES
[1] As described at oral argument on this appeal, a "harvest" references the killing of a deer and its lawful removal from the hunting field or forest. A "deer drive" consists of two groups of deer hunters, known as "drivers" and "standers". The former, arranged in a line spanning the breadth of the field or wooded area to be hunted, move in unison and common direction, each maintaining a distance of between fifty and sixty yards from the others, in commotive fashion, frightening all deer there present and "driving" the deer in the opposite direction and toward the latter who, having also achieved lineal formation, await the arrival of the driven deer at the far end of the field or wooded area, poised, with loaded weapons, to shoot. Such a "deer drive", while unfamiliar to this court, is apparently a logistical tactic routinely invoked in the hunting of deer.
[2] At oral argument on this appeal, this court addressed the coincidental circumstance that both the complaining witness, Division Conservation Officer Zane Batten, and the judge hearing the appeal share the same surname. Each is unrelated to and unfamiliar with the other.
[3] N.J.S.A. 23:4-47 states:

A person who kills a deer in this State at any time during the legal seasons shall immediately attach thereto the deer transportation tag supplied with the hunting license and shall transport the deer to a deer checking station before 7:00 p.m. on the day said deer was killed, for registering the kill and having a legal possession tag affixed, which possession tag shall remain attached until the carcass has been consumed.
Any person who shall fail to properly tag a deer and transport it to a checking station or who borrows, loans, transfers, buys, sells, or purloins any deer tag of another, shall be liable to the penalty prescribed by Section 23:4-48 of this Title.
[Emphasis added.]
[4] N.J.A.C. 7:25-5.27(b) states, in pertinent part:

(b) Bag Limit: Two antlered deer, with antler at least three inches long. Deer shall be tagged immediately with the "transportation tag" appropriate for the season, completely filled in and shall be transported to a checking station before 7:00 P.M. on the day killed to secure a legal possession tag. The legal possession tag must be securely affixed or locked on the deer before the deer is transported or removed from the authorized deer checking station. Hunters are responsible for legal possession tags being securely affixed or locked before leaving the deer check station. The possession of a deer after 7:00 P.M. E.S.T. on the date killed without a legal possession seal shall be deemed illegal possession. Upon completion of the registration of the first deer, one valid and proper "New Jersey Supplemental Deer Transportation Tag" will be issued which will allow that person to continue hunting and take one additional deer with antler at least three inches long during the current, six-day firearm season. The supplemental tag shall be valid on the day of issuance and all registration requirements apply.... Hunters who take two antlered deer during the six-day firearm season are prohibited from taking an antlered buck during the regular permit shotgun season. Any legally killed deer which is recovered too late to be brought to a check station by closing time shall be immediately reported by telephone to the nearest Division of Fish and Wildlife law enforcement regional headquarters. This deer must be brought to a checking station on the next open day to receive a legal "possession tag". If the season has concluded, this deer must be taken to a regular deer checking station on the following weekday to receive a legal "possession tag". It is unlawful to attempt to take or to continue to hunt for more than the number of deer permitted.
[Emphasis added.]
[5] In pertinent part, N.J.S.A. 23:4-48 states:

"... any person ... killing a deer in this State at any time and failing to report the same in the manner prescribed by the Division, or killing a deer in this State any time and failing to properly tag and transport the deer to a checking station for registration as provided in RS 23:4-47 ... shall be liable to a penalty of not less than $100 nor more than $500 for the first offense and not less than $300 nor more than $1,000 for the second and each subsequent offense."
[Emphasis added.]
[6] In Meinken, the defendant was stopped by a game warden who found beside him, in the front seat of his car, a .12 gauge shell loaded with one-ounce ball, in an area where deer are customarily found. Concluding that the gun there possessed  loaded with two shells  warranted an inference that the defendant intended to shoot deer, the court cautioned that an "intention [to hunt] cannot legitimately be inferred from the mere possession of a gun while driving in an area where deer might be found....". 10 N.J. at 353, 91 A.2d at 723. The statute there applicable yet repealed effective April 12, 1951, N.J.S.A. 23:4-24.1, provided, "whenever a person is found with such loaded shotgun or rifle in possession in a vehicle, the same shall be conclusive proof that the person was in the act of pursuing or taking birds or animals."
[7] See Alaska Stat. § 16.05.940.(21) ("hunting" means the taking of game ...); Conn. Gen.Stat. Ann. § 26-1.(12) ("Hunting" means pursuing, shooting, killing and capturing any bird, quadruped or reptile and attempting to pursue, shoot, kill and capture any bird, quadruped or reptile, whether such act results in taking or not, including any act of assistance to any other person in taking or attempting to take any such animal.); Ga.Code Ann. § 27-1-2.(39) ("Hunting" means pursuing, shooting, killing, taking, or capturing wildlife or feral hogs. This term also includes acts such as placing, setting, drawing, or using any device used to take wildlife or feral hogs, whether any such act results in taking or not, and includes every act of assistance to any person in taking or attempting to take such wildlife or feral hogs.); Iowa Code Ann. 481A.1 (32. "Take" or "taking" or "attempting to take" or "hunt" is any pursuing, or any hunting, fishing, killing, trapping, snaring, netting, searching for or shooting at, stalking or lying in wait for any game, animal, bird, or fish protected by the state laws or rules adopted by the commission whether or not such animal be then subsequently captured, killed, or injured.); Ky.Rev.Stat. Ann. § 150.010(12) ("Hunting" means to take or attempt to take in any manner, whether the hunter has game in possession or not;); La.Rev.Stat. Ann. § 56:116.1 ("Hunt" is legislatively defined with reference to "take," and take includes terms such as attempt to trap, shoot, hunt, wound, kill, hook, pursue, net, capture, and snare.); Me.Rev.Stat. Ann. Tit. 12, § 7001 (To "hunt" means to pursue, catch, take, kill or harvest wild animals or wild birds or to attempt to catch, take, kill or harvest wild animals or wild birds.); Minn.Stat. Ann. § 97A.015 ("Hunting" means taking birds or mammals.); Mont.Code. Ann. § 87-2-101((8) "Hunt" means to pursue, shoot, wound, kill, chase, lure, possess, or capture or the act of a person possessing a weapon, as defined in 45-2-101, or using a dog or a bird of prey for the purpose of shooting, wounding, killing, possessing, or capturing wildlife protected by the laws of this state in any location that wildlife may inhabit, whether or not the wildlife is then or subsequently taken. The term includes an attempt to take by any means, including but not limited to pursuing, shooting, wounding, killing, chasing, luring, possessing, or capturing); Neb.Rev.Stat. § 37-232 (Hunt means to pursue, shoot, catch, capture, collect, harvest, kill, destroy, or attempt to pursue, shoot, catch, capture, collect, harvest, kill, or destroy.); N.Y. E.C.L. Law § 11-0103 (10. "Hunting" means pursuing, shooting, killing or capturing (other than trapping as defined in subdivision 11) wildlife, except wildlife ...); Ohio Rev.Code Ann. § 1531.01((Y) "Hunting" means pursuing, shooting, killing, following after or on the trail of, lying in wait for, shooting at, or wounding wild birds or wild quadrupeds while employing any device commonly used to kill or wound wild birds or wild quadrupeds whether or not the acts result in killing or wounding. "Hunting" includes every attempt to kill or wound and every act of assistance to any other person in killing or wounding or attempting to kill or wound wild birds or wild quadrupeds.)(H); 34 Pa. Consol. Stat. Ann. § 102 ("Hunt" or "hunting." Any act or furtherance of the taking or killing of any game or wildlife, or any part or product thereof, and includes, but is not limited to, chasing, tracking, calling, pursuing, lying in wait, trapping, shooting at, including shooting at a game or wildlife facsimile, or wounding with any weapon or implement, or using any personal property, including dogs, or the property of others, of any nature, in furtherance of any of these purposes, or aiding, abetting or conspiring with another person in that purpose.) Tex. Parks & Wild.Code Ann. § 1.101((1) "Hunt" means capture, trap, take, or kill, or an attempt to capture, trap, take, or kill.); Wash. Rev.Code Ann. § 77.08.010((7) "To hunt" and its derivatives means an effort to kill, injure, capture, or harass a wild animal or wild bird.).
[8] The statutory definition of "hunting", N.J.S.A. 23:1-1, containing the "readily usable" standard, followed the Legislature's adoption of its definition for "inoperable" in N.J.S.A. 2C:58-13(c) ("Transfer of assault firearm to another; rendering inoperable") by eight years.